**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

SHAWN ADDISON,
 *Plaintiff,*

 v.

MARYLAND DEPARTMENT OF
PUBLIC SAFETY AND
CORRECTIONAL SERVICES, *et al.*,

 *Defendants.*

Civil No. ELH-25-846

**MEMORANDUM OPINION**

This civil rights action is rooted in the assault of plaintiff Shawn Addison, a Maryland

prisoner, while he was incarcerated at Jessup Correctional Institution ("JCI"). The assault, which

occurred on December 14, 2023, was allegedly committed by three correctional officers. Plaintiff

also alleges that two of the officers instigated a malicious criminal prosecution of plaintiff based

on fallacious allegations.

Through counsel, plaintiff has sued the following defendants: the Maryland Department of

Public Safety and Correctional Services ("DPSCS"); Robert S. Dean, Jr., the Warden of JCI; and

Correctional Officers ("CO") Chris Asangong, Desmond Ross, and Kenneth Gray. [1] *See* ECF 7

(Amended Complaint). The suit is supported by several exhibits. ECF 1-3 at 17-38; ECF 7-2 to

ECF 7-4.[2]

---

[1] Addison initially filed suit on December 11, 2024, in the Circuit Court for Howard
County. ECF 1-3; ECF 2. Defendants removed the case to this Court on March 14, 2025, based
on federal question jurisdiction. ECF 1. The First Amended Complaint followed on April 10,
2025. ECF 7.

[2] Plaintiff included four exhibits with his Complaint. But, when the case was removed
from State court, the Complaint and the exhibits were compiled into one document. *See* ECF 1-3.
Four exhibits are docketed collectively. *See* ECF 1-3 at 17–38; ECF 2 at 17–38. Plaintiff did not

1

The Amended Complaint contains five counts.  In Count I, lodged against Asangong, Ross, and Gray (collectively, "CO Defendants"), pursuant to 42 U.S.C.  §§ 1983 and 1988, plaintiff asserts that he was subjected to the use of excessive force, in violation of the Eighth Amendment.  ECF 7, ¶¶ 50–54.   Count II alleges supervisory liability against DPSCS and Warden Dean.  *Id.* ¶¶ 55–59.  In Count III, lodged against all defendants, plaintiff asserts violations of Articles 16 and 25 of the Maryland Declaration of Rights.  *Id.* ¶¶ 61–71.[3]  Count IV, lodged against DPSCS, asserts a claim under Maryland law for negligent training and supervision.  *Id.* ¶¶ 72–79.  Count V names Asangong and Gray and asserts a claim under federal and State law for malicious prosecution.  *Id.* ¶¶ 79–85.[4]

Defendants have moved to dismiss Counts II through V.  ECF 23.  The motion is supported by a memorandum of law.  ECF 23-1 (collectively, the "Motion").  In support of the Motion, defendants have submitted the declarations of Kristina M. Donnelly, an employee with DPSCS

---

include these exhibits with the Amended Complaint, however.  Instead, he incorporated them by reference.  *See* ECF 7 at 10 n. 1.

[3] The Amended Complaint fails to define the rights embodied in Articles 16 and 25 of the Maryland Declaration of Rights.  *See* ECF 7.  Article 16 states, in part, that "no Law to inflict cruel and unusual pains and penalties ought to be made."  Article 25 states: "[E]xcessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted. . . ."  Articles 16 and 25 are construed *in pari materia* with the Eighth Amendment.  *Evans v. State*, 396 Md. 256, 327, 914 A.2d 25, 67 (2006).

[4] The malicious prosecution claim fails to specify whether it is brought under State or federal law or both.  But, Addison has clarified that Count IV is premised on State and federal law.  *See* ECF 27 at 16.

2

(ECF 23-3, "Donnelly Declaration"), and F. Todd Taylor, Jr., the Director of the Incarcerated Individual Grievance Office ("IIGO")[5] (ECF 23-4, "Taylor Declaration"); ECF 32-1 (same).[6]

Defendants' Motion is based on numerous grounds.  As to Count II, defendants assert that DPSCS is not a "person" subject to suit under 42 U.S.C. § 1983.  ECF 23-1 at 9.[7]  And, as to Warden Dean, defendants claim that Count II fails to state a claim for supervisory liability under 42 U.S.C. § 1983.  *Id.* at 10.  With respect to Counts III, IV, and V, defendants contend that Addison failed to exhaust his administrative remedies, as required by the Maryland Prisoner Litigation Act ("MPLA"), § 5-1003 of the Courts and Judicial Proceedings Article ("C.J." or "Courts Article") of the Maryland Code (2020 Repl. Vol., 2025 Supp.).  *See* ECF 23-1 at 13.  With respect to Count IV and Count V, defendants also argue that plaintiff did not satisfy the notice requirement of the Maryland State Tort Claims Act ("MTCA"), § 12–101 to § 12–110 of the State Government Article ("S.G.") of the Maryland Code (2021 Repl. Vol., 2025 Supp.).  *See* ECF 23-1 at 17.  Moreover, according to defendants, Counts III, IV, and V are subject to dismissal because plaintiff failed to comply with S.G. § 12-106(b)(2), which prohibits a claimant from instituting an action under the MTCA unless the Treasurer issues a final denial.  *Id.* at 18–19.  In addition, defendants contend that Count V is subject to dismissal because plaintiff cannot establish that Asangong and Gray *caused* plaintiff's State prosecution.  *Id.* at 19; ECF 32 at 12–15.

---

[5] Effective October 1, 2023, the Inmate Grievance Office was renamed the Incarcerated Individual Grievance Office.  *See* 2023 Md. Laws, Ch. 721.

[6] ECF 23-4 was not signed by Taylor.  But, defendants attached an executed version with their Reply.  *See* ECF 32-1.  The content of ECF 32-1 is identical to the content of ECF 23-4.

[7] Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not always correspond to the page number imprinted on a particular submission.

Plaintiff opposes the Motion.  ECF 27 (the "Opposition").  Addison maintains that he has sufficiently alleged a supervisory liability claim against Warden Dean, pursuant to § 1983.  *Id.* at 11.  He also contends that he exhausted his available administrative remedies as to Counts III and IV.  But, with respect to the claim of malicious prosecution (Count V), which is founded on both federal and Maryland law, he contends that administrative exhaustion is not required.  *Id.* at 13.  Moreover, Addison contends that he has sufficiently alleged a malicious prosecution claim under both federal and Maryland law.  *Id.* at 21.  Further, Addison maintains that he satisfied the MTCA's notice requirement as to Counts III and IV, but argues that the MTCA does not apply to Count V.  *Id.* at 16, 20.

Notably, as to Count II, Addison concedes that DPSCS is not a "person" subject to suit under 42 U.S.C. § 1983.  Therefore, he asserts that he "will voluntarily dismiss DPSCS from Count II only."  *Id.* at 11 n.2.  Defendants have replied.  ECF 32.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part and deny it in part.  In particular, pursuant to plaintiff's concession, I shall dismiss Count II as to DPSCS.  I shall also dismiss Count II against Warden Dean, without prejudice.  But, I shall deny the Motion with respect to Counts III, IV, and V.

## I.  Factual Background[8]

### A.  The Assault of December 14, 2023

On the morning of December 14, 2023, Addison was housed in Cell 713 at JCI, located on the B/C tier.  ECF 7, ¶ 14.  He shared the cell with inmate Terrick Myers.  *Id.* ¶ 15.  At

---

[8] As discussed, *infra,* at this juncture I must assume the truth of the facts alleged in the suit. *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019).  Therefore, the factual summary derives from plaintiff's Amended Complaint.  ECF 7.

approximately 7:30 a.m., the CO Defendants entered the cell to conduct a cell search and strip search of both prisoners. *Id.* ¶¶ 14, 16.

The CO Defendants ordered Addison and Myers to "cuff up," meaning that they were to permit the CO Defendants to place them in handcuffs. *Id.* ¶ 15. Addison and Myers complied. *Id.* The CO Defendants then escorted Addison from the cell while conducting a strip search of Myers in the cell. *Id.* ¶ 16. After searching Myers, the CO Defendants brought plaintiff back into the cell to strip search him. *Id.* ¶ 16. They ordered Addison to "walk to the wall and stay facing the wall, as they removed his handcuffs." *Id.* ¶ 17. Plaintiff complied. *Id.*

Thereafter, CO Ross "ordered Mr. Addison to take his clothes off piece by piece and pass each clothing item over his right shoulder." *Id.* ¶ 18. Again, Addison complied. *Id.* When Addison was only in his underwear, Asangong ordered plaintiff to "'drop [his underwear], squat, and cough.'" *Id.* ¶ 19 (alteration in ECF 7). Addison "complied, and then pulled his underwear back up." *Id.* But, CO Ross then ordered Addison to remove his underwear "all the way off and do it again." *Id.* ¶ 20.

In response, Addison told Ross "that he was only trying to get the search over with, get out of the CO Defendants' way, and get his DPSCS-issued tablet. . . repaired." *Id.* Addison explained that he "wanted to [use it] to talk to his friends and family." *Id.* Ross stated: "I don't know why the fuck we keep talking to you. Put your hands behind your back." *Id.* Addison complied and was then handcuffed. *Id.* ¶¶ 20, 21.

The CO Defendants "began to escort Mr. Addison—dressed only his underwear—out of his cell." *Id.* ¶ 21. Addison "planted his foot" and asked to put on his sweatpants "because he felt uncomfortable and unsafe walking down to disciplinary segregation in only his underwear." *Id.*

One of the CO Defendants responded: "We don't give a fuck about that." *Id.* ¶ 22.[9] Addison reiterated his request to "at least put some clothes back on . . . ." *Id.*

"Immediately" thereafter, the CO Defendants "slammed Mr. Addison's body to the ground and began pulling his hair, punching him, kicking him in his head, and stomping his face with their boots." *Id.* ¶ 23. Addison "screamed at the top of his lungs." *Id.*

The CO Defendants then "dragged Mr. Addison through the tier, over a metal grate, and down a flight of stairs headfirst." *Id.* ¶ 24. According to plaintiff, a CO Defendant said: "'[L]et's just drag his bitch ass all the way up to [the Medical Department].'" *Id.* (second alteration in ECF 7).[10] But, another CO who was in the hallway intervened and "told the CO Defendants that they could not drag Mr. Addison to the Medical Department and got Mr. Addison a wheelchair." *Id.*

While Addison was on the floor, waiting for a wheelchair, he stated that he intended to sue the CO Defendants. *Id.* ¶ 25. Then, as alleged by Addison, *id.*:

> CO Ross responded by pointing at CO Asangong and saying, "He hit you?" then pointing to CO Gray, stating, "He hit you?" then referring to himself, stating "He hit me too. That's five, ten, fifteen years—he [is] never going home."

Lieutenant Owolabi, a supervisor, transported Addison, still wearing only his boxers, in a wheelchair to the Medical Department. *Id.* ¶ 26. Addison's injuries included a "swollen shut" right eye with visible bruising; swelling and bruising to the right side of his face, "from his eye to his jaw"; bruising of his right hip; cuts to his wrists; and a torn meniscus in his right knee. *Id.* ¶¶ 27, 28. Addison was taken to the emergency room at the University of Maryland Baltimore-

---

[9] In the Amended Complaint, Addison does not identify which CO Defendant made the comment. ECF 7, ¶ 21.

[10] Addison does not identify the particular CO Defendant who made the remark. ECF 7, ¶ 24.

Washington Medical Center's (the "Hospital") for treatment. *Id.* ¶ 29. Plaintiff remained at the Hospital that night for additional testing. *Id.*

The medical staff at the Hospital determined that Addison had bleeding in his right eye, and that "the right side of Mr. Addison's face was swollen, he had cuts on his right eyelid, and had pain in his right hip." *Id.* ¶ 30. Addison was discharged from the Hospital on December 15, 2023. *Id.* ¶ 31. Upon discharge, Addison was transferred to Maryland Correctional Institution-Jessup ("MCI-J"), another DPSCS facility in Jessup, Maryland. *Id.*

According to Addison, after the attack, he was "wrongly charged with Inmate Rule Violations . . . ." *Id.* ¶ 32. In particular, he was charged with six rule violations, *id.*:

> 100 (participate in a disruptive act), 101 (assault or battery on staff), 104 (make threats that include the use of physical harm to objects, property, or individuals), 312 (interfere with or resist a search of a person, item, area, or location), 316 (disobey an order), and 410 (demonstrate disrespect).

Addison was found not guilty of two rules violations: participation in a disruptive act (100) and assault (101). But, he was found guilty of charges as to rules 104, 312, 316, and 410. *Id.*; *see* ECF 7-2 ("Notice of Inmate Rule Violation"). Addison appealed, and his violations were "overturned." ECF 7, ¶ 32.[11]

Plaintiff alleges that, prior to the attack on December 14, 2023, he suffered from anxiety and depression. *Id.* ¶ 41. But, he contends that, after the attack, his conditions worsened. *Id.* Moreover, plaintiff alleges that, as a result of the attack, he has post-traumatic stress disorder ("PTSD"), "which has caused him to have nightmares, difficulty sleeping, and at least one panic attack." *Id.* In addition, he asserts that he now suffers from "photosensitivity [of the eye], for which he has been prescribed tinted glasses." *Id.* ¶ 30.

---

[11] Addison asserts that he appealed "the remaining three charges . . . ." ECF 7, ¶ 32. But, there were four remaining charges, according to the allegations. *Id.*

**B.  Retaliation at MCI-J**

Addison alleges that, following his transfer to MCI-J, he was the victim of several acts of retaliation.  ECF 7, ¶ 33.  In particular, he identifies four instances of retaliation that occurred between June 3, 2024, and September 18, 2024.  *Id.* ¶¶ 34–37.  However, Addison does not assert any claims based on the four alleged retaliatory acts that occurred at MCI-J.  Nor has Addison named as defendants the individuals allegedly involved in these four incidents: CO Lawson, Lieutenant Boddi, CO Nkazu, Sergeant Kanu, and CO Bologen.  But, one of the alleged retaliatory events—namely, the "shakedown" of Addison's cell on September 18, 2024—is pertinent to the issue of exhaustion of administrative remedies.

According to Addison, on June 3, 2024, during the 3:00 p.m.-11:00 p.m. shift, he was attacked by two inmates while he and his cellmate were outside their cell, preparing to go to recreation.  *Id.* ¶ 34.  Ordinarily, only two correctional officers are present for such an escort, according to Addison.  *Id.*  Yet, on this occasion, about eight to ten correctional officers were present.  *Id.*  Moreover, as part of the "routine procedure," when prisoners on segregation or in protective custody are outside their cells, other inmates are "on lockdown."  *Id.*  But, on this occasion, the inmate custodial workers were not on lockdown.  *Id.*

One inmate "tried to hit Mr. Addison on the head with [a broom]."  *Id.*  In response, Addison "raised his cuffed hands to the middle of his back and turned his body to avoid being hit, at which time Mr. Addison's left hand came loose from the handcuffs."  *Id.*  A second inmate "ran onto the tier" and "kicked Mr. Addison in the head."  *Id.*  Two correctional officers restrained Addison with a second pair of handcuffs and took him to the Medical Unit because he sustained injuries to his head and right hand.  *Id.*

On September 11, 2024, CO Lawson and Lieutenant Boddi[12] served a food tray to Addison through "a feed slot on his cell door" and the tray appeared to have feces on it. *Id.* ¶ 35. When Addison refused to take the tray, "Lawson tried to provide Mr. Addison with a different tray, but Lt. Boddi gave Mr. Addison the tray with feces on it." *Id.*

Also on September 11, 2024, CO Nkazu interrupted Addison's "allotted phone time." *Id.* ¶ 36. Addison alleges that, while he was on the phone, "Nkazu told him to get off because he was moving the [rolling telephone] cart to the next cell." *Id.* Addison "protested" and explained that his cellmate had not yet gotten his thirty minutes of phone time. *Id.* When Addison tried to give the phone to his cellmate, Nkazu "grabbed the base and the phone, yanking the cord across Mr. Addison's arm, and bruising it." *Id.* Nkazu then "point[ed] at Mr. Addison [and] yelled throughout the tier, 'He's in here for touching little boys.'" *Id.* According to Addison, this "is not true and put Mr. Addison's life at risk," because "inmates who are pedophiles or who are convicted of sex offenses are at greater risk of physical harm than those convicted of non-sex offense crimes." *Id.*

Further, Addison alleges that "[o]n September 18, 2024, Lt. Boddi and Sergeant Kanu performed a shakedown of Mr. Addison's cell." *Id.* ¶ 37. Prior to this "shakedown," Boddi put Addison in handcuffs, and CO Bologen moved Addison "out of his cell and to the corner of the tier and held him there so he could not see Lt. Boddi or Sgt. Kanu search his cell." *Id.* Boddi and Kanu "closed the door" to Addison's cell so that "Addison could not observe them." *Id.* When Addison returned to his cell after the search, "his mattress was flipped over, and some of his legal papers were missing, including his Representation Agreement" with his lawyer, as well as "copies

_____

[12] In Addison's Declaration, appended to the suit (ECF 1-3 at 35-38; ECF 2 at 37-38), plaintiff identifies a Lieutenant "Botti" as one of the individuals who searched plaintiff's cell on September 18, 2024. ECF 1-3 at 37. In the Amended Complaint, however, he refers to Lieutenant Boddi. *See* ECF 7, ¶¶ 37, 49.

of his IGO appeals, and ARPs." *Id.*  Addison alleges that, as of the date of the filing of the Amended Complaint, DPSCS had not returned his papers to him. *Id.*

Addison was transferred to Eastern Correctional Institution ("ECI") in Westover, Maryland on October 15, 2024. *Id.* ¶ 38.  At ECI, Addison alleges that his "medication was discontinued, and he was unable to obtain refills of his medications. . . ." *Id.* ¶ 42.

### C.  Criminal Prosecution of Addison

Addison alleges that approximately one month after his transfer to ECI, "[o]n November 12, 2024, DPSCS brought two unfounded assault charges against Addison arising out of the December 14, 2023, attack on Mr. Addison by COs Ross, Gray, and Asangong." *Id.* ¶ 39.[13]  The Statement of Charges (ECF 7-3) is dated November 12, 2024, and signed by Detective Sergeant D. Bonvegna.  ECF 7, ¶ 39.[14]

Plaintiff asserts that the Statement of Charges (ECF 7-3) is "nearly identical to the (false) narrative of events on the Notice of Inmate Rule Violation, on which Mr. Addison was found *not guilty of all charges.*"  ECF 7, ¶ 39 (emphasis in original).  The Statement of Charges asserts, in part: "During the investigation COII Asangong, COII Ross, COII Gray, and COII Akinwekomi were interviewed and provided the same account of the incident."  ECF 7-3 at 5.

Addison's criminal trial was scheduled for January 27, 2024, in the District Court of Maryland for Anne Arundel County.  ECF 7, ¶ 40.  On January 24, 2025, Addison was transferred

---

[13] DPSCS cannot bring criminal charges, as alleged.  That is the function of the State. *See, e.g., Myers v. State*, 58 Md. App. 211, 231, 472 A.2d 1027, 1037 (1984) ("All prosecutions are conducted by and on behalf of the State.").  But, an individual or an entity can file an application for charges. *See St. Rose v. Baltimore Cnty. Det. Ctr.*, JKB-23-1031, 2023 WL 3454590, at *1 (D. Md. May 15, 2023) ("A Statement of Charges Application is the first step in a process which allows an individual to file state criminal charges in Maryland.").

[14] The Court could not locate Bonvegna's first name in the information provided by the parties.

from ECI to JCI for the trial, because of JCI's proximity to the court, located in Glen Burnie, Maryland. *Id.* ¶ 43. Addison was "forced to stay at JCI—the very prison at which he was assaulted and where the CO Defendants still work[ed]—for two days and three nights without his medications[.]" *Id.* At JCI, "Addison suffered severe PTSD symptoms and had serious difficulty sleeping as he feared for his life." *Id.*

On the date of the trial, January 27, 2025,[15] Asangong and Gray appeared in court. *Id.* ¶ 44. But, the trial was postponed, at the joint request of the State and Addison's defense attorney, because "DPSCS had not provided the internal Report of Investigation of Mr. Addison's alleged assault on CO Defendants Asangong and Gray that supposedly provided the probable cause necessary to charge Mr. Addison." *Id.*

Addison's trial was rescheduled to March 5, 2025. *Id.* ¶ 45. On March 4, 2025, he was again transferred to JCI because of its proximity to the Glen Burnie courthouse. *Id.* Once again, he "suffered severe psychological distress and had difficulty sleeping." *Id.*

At trial, the court entered nolle prosequi dispositions with respect to both assault charges. *Id.* ¶ 46 (citing ECF 7-4, "Defendant Trial Summary").

### D. Administrative Exhaustion

According to plaintiff, "[o]n or about December 17, 2023, [he] filed an administrative grievance ('ARP') in which he detailed the December 14, 2023 assault on him by CO Defendants, including the circumstances leading up to the assault.[]" *Id.* ¶ 47; *see* ECF 1-3 at 26–29 ("December 17, 2023 ARP"). But, Addison contends that DPSCS dismissed the December 17, 2023 ARP because Addison requested therapy as part of his relief. ECF 7, ¶ 47. DPSCS informed

---

[15] In his Amended Complaint, plaintiff identifies the date of the trial as January 24, 202**4**. ECF 7, ¶¶ 40, 44. But, this appears to be a typographical error.

Addison "that he could not request that form of relief as part of the ARP process." *Id.* Addison attached the December 17, 2023 ARP as an exhibit to his Complaint. *See* ECF 1-3 at 26–29.

Then, "on or about January 12, 2024, Mr. Addison filed a second ARP regarding the December 14, 2023 assault on him by CO Defendants." *Id.* ¶ 48; *see* ECF 1-3 at 30–34 ("January 12, 2024 ARP"). But, he claims that DPSCS dismissed the January 12, 2024 ARP for procedural reasons. *Id.* ¶ 48. A stamp on the January 12, 2024 ARP states: "Dismissed for procedural reasons: Final per [Code of Maryland Regulations ('COMAR')] 12.02.28.04.B(3). Inmates may not seek relief through the [ARP] regarding disciplinary proceeding procedures and decisions." *Id.* Addison alleges that he "filed a timely appeal to the Warden, but the Warden never responded." ECF 7, ¶ 48. Further, Addison asserts that he "filed a timely appeal to IGO [*i.e.*, Inmate Grievance Office], which similarly has failed to respond." *Id.*

Addison reiterates that on September 18, 2024, Boddi and Kanu "took Mr. Addison's legal documents," which included "the receipts from his ARPs, appeals to the Warden, and appeals to the IGO." *Id.* ¶ 49 (citing "Addison Declaration," ECF 1-3 at 35–38). Addison avers: "On January 27, 2024, I filed a timely appeal to the Warden, but the Warden never responded. On February 14, 2024, I then filed a timely appeal to the IGO, but the IGO never responded." ECF 1-3 at 37, ¶ 5. However, Addison alleges that he cannot attach proof of exhaustion beyond his allegations, the December 17, 2023 ARP, the January 12, 2024 ARP, and the Addison Declaration. *Id.*

Plaintiff also alleges that he has fully complied with the MTCA, S.G. § 12-106, through his counsel's submission of written notice to the Maryland State Treasurer via its electronic claims portal on April 17, 2024. ECF 7, ¶ 12; *see* ECF 1-3 at 18–24 ("Notice of Claim"). In the Notice of Claim, with respect to the "Description of Incident," plaintiff's counsel wrote: "Attacked by correctional officers at JCI on 12/14/23, and sustained injuries to face, head, and body." *Id.* at 22.

12

On April 23, 2024, Ray Garvey, a representative from the Insurance Division of the Maryland State Treasurer's Office, wrote to plaintiff's counsel, stating, ECF 1-3 at 25 (emphasis added):

> I am in receipt of your correspondence dated April 17, 2024, regarding the above referenced claim. Before the Treasurer's Office considers a claim filed by persons confined in an institution within the Division of Corrections, we require that you file a complaint with the Inmate Grievance Office (IGO), with a copy of this letter. *Our decision on this matter will be stayed pending the Treasurer's receipt of the decision from the IGO.*
>
> If your complaint is dismissed by the IGO as wholly lacking in merit, we will proceed to process your claim, upon receipt of notification from IGO, in accordance with COMAR 25.02.03. However, if the IGO recommends to the Secretary of Public Safety and Correctional Services that you be awarded monetary damages and the Secretary affirms the IGO's recommendation, the Treasurer, upon receipt of the Secretary's decision, shall process your claim in accordance with COMAR 25.02.03 and may rely on fact-finding undertaken by the IGO.

Additional facts are included, *infra.*

## II. Legal Standards

### A.

Defendants have moved to dismiss all but Count I, pursuant to Fed. R. Civ. P. 12(b)(6). *See* ECF 23, ECF 23-1. A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Nadendla v. WakeMed*, 24 F.4th 299, 304–05 (4th Cir. 2022); *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021); *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017), *cert. denied*, 583 U.S. 1008 (2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013). A Rule 12(b)(6) motion constitutes an assertion by a

defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).

The "court's role under Rule 12(b)(6) is to evaluate the sufficiency of a complaint . . . ." *Doriety v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024).  Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).  Fed. R. Civ. P. 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *see Brown-Hyatt v. Brenner*, SAG-25-1737, 2025 WL 2855769, at *2 (D. Md. Oct. 8, 2025) (same).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions'"); *Johnson v. Baltimore City, Maryland*, 163 F.4th 808, 814 (4th Cir. 2026); *Harmon v. Coleman Worldwide Moving, LLC*, 2025 WL 3764220, at *1 (4th Cir. Dec. 30, 2025) (per curiam); *Seabrook v. Driscoll*, 148 F.4th 264, 269 (4th Cir. 2025); *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025); *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021); *Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan*, 918 F.3d at 317–18; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  A plausible claim is one that is more than merely conceivable or speculative.  *Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

14

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

As the Fourth Circuit has recognized, plaintiffs are not required "to prove [their] case in the complaint." *Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 291 (4th Cir. 2012) (recognizing that "[t]he requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at [her] disposal at the outset"); *see Lowy v. Daniel Defense, LLC,* 167 F.4th 175, 193 (4th Cir. 2026). Furthermore, Rule 12(b)(6) "does not countenance . . . dismissal based on a judge's disbelief of a complaint's factual allegations." *See Neitzke v. Williams*, 490 U.S. 319, 327 (1989). Indeed, it is "error" for a district judge to give "a serious claim the back of its hand" because it does not believe the plaintiff's allegations. *See Colon Health Ctrs. of Am., LLC v. Hazel,* 733 F.3d 535, 545 (4th Cir. 2013).

Rather, in considering a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Johnson*, 163 F.4th at 814; *Bermeo v. Andis*, 163 F.4th 87, 93 (4th Cir. 2025)*; Hebb v. City of Asheville, N. Carolina,* 145 F.4th 421, 432 (4th Cir. 2025); *Barbour v. Garland,* 105 F.4th 579, 589 (4th Cir. 2024); *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020); *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal

15

conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010). Nor does the court accept "'legal conclusions couched as facts . . . .'" *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (citation omitted).

"A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012). But, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy Federal Credit Union*, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022); *see Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021).

That said, a plaintiff need not include "detailed factual allegations" to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam). However, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted); *see Johnson v. Navy Fed. Credit Union*, No. 23-2057, 2025 WL 2437832, at *2 (4th Cir. Aug. 25, 2025) (per curiam).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n

16

unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678; *see Katti v. Arden*, 161 F.4th 217, 224 (4th Cir. 2025). Instead, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable, and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

Ordinarily, when ruling on a Rule 12(b)(6) motion, a court does not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023); *Bing v. Brio Sys.*, LLC, 959 F.3d 605, 616 (4th Cir. 2020). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear [] *on the face of the complaint.*'" *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250); *see L.N.P. v. Kijakazi*, 64 F.4th 577, 585–86 (4th Cir. 2023).

It is well settled that a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing. *See, e.g.*, *Henderson v. City of Roanoke*, 2022 WL 704351, at *3 (4th Cir. Mar. 9, 2022) (per curiam) ("[N]o litigant is exempt from the well-established rule 'that parties cannot amend their complaints through briefing or oral advocacy.'")

(quoting *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)); *Glenn v. Wells Fargo Bank, N.A.*, DKC-15-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not included in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).   But, in civil rights cases, at the Rule 12(b)(6) stage, courts "must be especially solicitous of the wrongs alleged" and "must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief *under any legal theory which might plausibly be suggested by the facts alleged*." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (internal quotations and citations omitted) (emphasis in original); *accord Pinkett v. Crowder*, ELH-13-2509, 2014 WL 3571802, at *6 (D. Md. July 18, 2014) (citing *Edwards*).

**B.**

As noted, plaintiff appended several exhibits to the Complaint and to the Amended Complaint, and incorporated in the Amended Complaint the exhibits appended to the Complaint. *See* ECF 1-3 at 17-38; ECF 7-2 to ECF 7-4; ECF 7 at 10 n.1.   ECF 7-2 contains the Notice of Inmate Rule Violation and the Inmate Hearing Record.   ECF 7-3 consists of the "Criminal Summons On Charging Docket" as well as the "Statement Of Charges," dated November 11, 2024, and the "Application For Statement of Charges."   ECF 7-4 is the "Defendant Trial Summary" as to proceedings held on March 5, 2025, in the District Court of Maryland for Anne Arundel County. ECF 1-3 at 17–25 includes plaintiff's Notice of Claim and letter from the Maryland State Treasurer ("Treasurer Letter").   Plaintiff's December 17, 2023 ARP is docketed at ECF 1-3 at 26-29.

18

Plaintiff's January 12, 2024 ARP is docketed at ECF 1-3 at 30-34. And, the Addison Declaration is at ECF 1-3 at 35-38.

As mentioned, defendants submitted the declarations of Donnelly (ECF 23-3) and Taylor. ECF 23-4, ECF 32-1. "Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448); *see Goines*, 822 F.3d at 166 (citation omitted) (a court may properly consider documents that are "explicitly incorporated into the complaint by reference . . . and those attached to the complaint as exhibits"); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Under limited circumstances, however, a court may consider documents beyond the complaint, without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Finn v. Humane Soc'y of the United States*, 160 F.4th 92, 96 n.2 (4th Cir. 2025); *Doriety,* 109 F.4th at 679; *Fusaro*

19

*v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied sub nom.*, *City of Greensboro v. BNT Ad Agency, LLC*, 583 U.S. 1044 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012); *Carrington Sturgis v. Warden Jeff Nines*, SAG-25-841, 2025 WL 3240039, at *2 (D. Md. Nov. 20, 2025); *Kristen Moody v. The Board of Education of Wicomico* County, SAG-25-00642, 2025 WL 3119201, at *4 (D. Md. Nov. 7, 2025). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (emphasis in *Chesapeake Bay Found., Inc.*) (citation omitted); *see also Brentzel v. Fairfax Transfer and Storage, Inc.,* 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (per curiam).

In the usual course, the "exhibit-prevails rule" applies. It "provides that 'in the event of [a] conflict between the bare allegations of the complaint and any exhibit attached . . . the exhibit prevails.'" *Goines*, 822 F.3d at 166 (citing *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)). However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the [party] attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

In the context of a Rule 12(b)(6) motion, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011); *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may only take judicial notice of adjudicative facts if they are "not subject to reasonable dispute," in that they are "(1) [] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

In addition, a court "may take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment." *Brown v. Ocwen Loan Servicing, LLC*, PJM 14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 F. App'x 200 (4th Cir. 2016). And, the Fourth Circuit has stated that a district court may take "judicial notice of its own records." *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990); *see also Thurman v. Robinson*, 51 F.3d 268, 1995 WL 133350, at *2 (4th Cir. Mar. 28, 1995) (per curiam); *United States Fidelity & Guar. Co. v. Lawrenson,* 334 F.2d 464, 467 (4th Cir. 1964).

Other legal principles are addressed in the Discussion.

### III. Discussion

### A.  Defendants' Declarations

To establish plaintiff's non-compliance with his exhaustion requirements, defendants seek to use the declarations of Donnelly and Taylor to introduce facts outside the Amended Complaint. According to defendants, the declarations of Donnelly and Taylor refute plaintiff's claim that he

exhausted his administrative remedies. Moreover, defendants argue, *inter alia,* that the declarations are integral to the Amended Complaint because plaintiff references documents that are discussed in the declarations. ECF 32 at 5–6. As previously stated, to be "integral" to the suit, a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc.*, 794 F. Supp. 2d at 611 (emphasis in original) (citation omitted).[16]

Donnelly is Special Assistant to the Director of the Patuxent Institution, which is a part of DPSCS. She avers that she has "access to requests for administrative remedies ('ARPs') that are appealed by incarcerated individuals throughout the Maryland Division of Correction and Patuxent Institution to the Commissioner of Correction." ECF 23-3, ¶ 1. Further, she declares that the "Headquarters Administrative Remedy Procedure (ARP)/Inmate Grievance Program (IGP) Unit maintains a database record of ARP appeals filed from 2009 to the present." *Id.* ¶ 3. According to Donnelly, "[a] search of the available records disclosed that the only ARP grievance II Addison has appealed to the Commissioner of Correction was filed on January 21, 2025, and the appeal is not related to the allegations made in this action." *Id.* ¶ 5.

Taylor is the Director of the IIGO, formerly known as the IGO. ECF 23-4, ¶ 1. The IIGO is part of DPSCS. *Id.* He avers that he is "familiar with Maryland's statutory incarcerated individual grievance process and the record maintenance practices of the IIGO." *Id.* ¶ 2. According to Taylor, a "search of the available records was conducted on April 16, 2025 [and] disclosed that II Addison has never filed a grievance with the IIGO." *Id.* ¶ 5.

---

[16] In my view, whether the Court may consider these declarations is a procedural matter, for which federal law applies. *See* Fed. R. Civ. P. 81(c)(1). Defendants removed the case to federal court. Defendants seemingly ask this Court to consider these declarations because Maryland procedural law would permit them to do so. But, defendants are bound by federal procedural law, not state procedural law.

Defendants cite *Okorie v. Resident Research, LLC*, 617 F. Supp. 3d 320 (D. Md. 2022), to support their position that the declarations may be considered at this juncture. In *Okorie*, the court emphasized that "the Complaint specifically references the rental application process," and determined that a rental application was integral to the complaint. *Id.* at 323. But here, defendants ask the Court to consider facts that are not alleged in the suit.

But, the declarations themselves do not give rise to plaintiff's legal rights. Moreover, the declarations directly contradict facts expressly alleged in the Amended Complaint which, at this stage, must be accepted as true. For example, Donnelly states: "A search of the available records disclosed that the only ARP grievance II Addison has appealed to the Commissioner of Correction was filed on January 21, 2025, and the appeal is not related to the allegations made in this action." ECF 23-3 at 2. And, Taylor states: "Addison has never filed a grievance with the IIGO." ECF 23-4 at 2. In contrast, plaintiff alleges that he filed timely appeals to both the Commissioner of Correction and the IIGO. ECF 7, ¶ 48.

Defendants have filed a partial motion to dismiss, pursuant to Rule 12(b)(6), not a motion for summary judgment, pursuant to Rule 56. *See* ECF 23-1. The Fourth Circuit has said that "a Rule 12(b)(6) motion to dismiss, which addresses the sufficiency of the complaint, generally does not enable the court to determine whether the exhaustion requirement has been satisfied or whether it has been waived or should be excused, because exhaustion is treated as an affirmative defense." *L.N.P.*, 64 F.4th at 585.

Defendants seem to suggest that exhaustion is an element of the various State claims. But, to the extent that exhaustion is an affirmative defense, courts generally consider an affirmative defense at the motion to dismiss stage "only in the 'relatively rare circumstances'

when 'all facts necessary to the affirmative defense clearly appear on the face of the complaint.'" *Id.* at 586 (quoting *Goodman*, 494 F.3d at 464).

Fed. R. Civ. P. 12(d) is also pertinent. It provides: "If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." If I were to consider the declarations, the Motion would be converted to one for summary judgment. *Wilson-Cook Medical, Inc. v. Wilson*, 942 F.2d 247, 252 (4th Cir. 1991); *see also Fonte v. Board of Mgers. of Continental Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988) ("If the district court *considered* the affidavit in disposing of the Rule 12(b)(6) motion, it erred in failing to convert the motion to one for summary judgment as the rule requires." (citations omitted; emphasis added)); *Goldman v. Belden*, 754 F.2d 1059, 1066 (2nd Cir. 1985) ("Rule 12(b) provides that to the extent that the court decides to consider matters outside of the complaint in ruling on a motion pursuant to Rule 12(b)(6), 'the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . .'").

Under Rule 12(d), a court has "'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it, or simply not consider it.'" *Sager v. Hous. Comm'n,* 855 F. Supp. 2d 524, 542 (D. Md. 2012) (quoting 5C Charles Alan Wright et al., *Federal Practice & Procedure* § 1366 (3d ed. 2004, 2011 Supp.)). However, it would be improper for the Court to convert the Motion to one for summary judgment before discovery has begun, and because plaintiff has not received notice. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 5 (1986) ("[S]ummary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his

24

Case 1:25-cv-00846-ELH   Document 44   Filed 03/20/26   Page 25 of 71

opposition."); *E.I. du Pont de Nemours & Co.,* 637 F.3d at 448–49 (finding summary judgment inappropriate "where the parties have not had an opportunity for reasonable discovery"); *Laughlin v. Metro Washington Airports Auth.*, 149 F. 3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court—instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Hous., LLC v. City of Salisbury, Md.*, 672 F. App'x 220, 220 (4th Cir. 2016) (per curiam) ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'").

In their Reply, defendants raise, for the first time, that the court may take judicial notice of the information contained in the declarations. ECF 32 at 6.[17]  Federal Rule of Evidence 201 provides that a court may take judicial notice of facts that are "not subject to reasonable dispute because" they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

The consequences of a court taking judicial notice are significant. For example, where the trial court has taken judicial notice of a fact in a civil matter, the judge must instruct the jury to accept that fact as conclusive. Fed. R. Evid. 201(g). A court that takes judicial notice may also preclude the introduction of evidence to disprove the noticed fact. *See* Fed. R. Evid. 201(g) Advisory Committee Note (discussing controversy surrounding whether evidence may be

---

[17] Plaintiff did not have an opportunity to respond to this argument.

25

admitted to disprove facts judicially noticed). As stated in the Advisory Committee Notes to Rule 201, a "tradition of circumspection" surrounds judicial notice of adjudicative facts, and courts should exercise caution in taking judicial notice, doing so only when the matter is beyond reasonable controversy. Fed. R. Evid. 201(b) Advisory Committee Note.

The materials for which defendants ask the Court to take notice pertain to the very issues in dispute—plaintiff's administrative exhaustion—and are not proper for judicial notice. *See Jehovah v. Clarke*, 620 F. App'x 202, 204 (4th Cir. 2015) (denying motion for judicial notice because such facts were subject to reasonable dispute); *United States v. Hawkins*, 76 F.3d 545, 551-52 (4th Cir. 1996) (observing that under Fed. R. Evid. 201, the court may not take judicial notice of facts subject to reasonable dispute); *see also Boshea v. Compass Mktg., Inc.,* ELH-21-00309, 2023 WL 7089917, at *5 (D. Md. Oct. 26, 2023) (stating that "facts that are significantly disputed are not appropriate for judicial notice").

Under *L.N.P.*, 64 F.4th at 586, this matter does not fall into the category of a rare case where "'facts sufficient to rule on an affirmative defense [such as exhaustion] are alleged in the complaint.'" *Id.* (quoting *Goodman*, 494 F.3d at 464). Defendants, through the declarations, present a competing version of plaintiff's allegations, which is plainly inappropriate for the court to consider at this stage of the proceedings. *See Barringer v. Progressive Select Ins. Co.*, DKC-25-1414, 2026 WL 41092, at *7 (D. Md. Jan. 7, 2026) (denying motion to dismiss or, in the alternative, for summary judgment where plaintiff alleged that she had administratively exhausted her insurance-related claims, but defendants provided an affidavit stating that she did not).

In sum, I conclude that the contents of the declarations are neither "explicitly incorporated into the complaint by reference" nor "integral to the complaint." *Goines,* 822 F.3d at 165–66. Therefore, I may not consider them in the current posture of the case.

26

**B. Supervisory Liability**

Count II asserts supervisory liability as to Warden Dean.  It is lodged pursuant to 42 U.S.C. § 1983.  *See* ECF 7, ¶¶ 50–54, 55–59.

Addison alleges that, "[o]n information and belief, the subject attack was not the first time the CO Defendants exacted vigilante justice against a DPSCS prisoner" and, "[d]espite the CO Defendants' previous misconduct, DPSCS and its supervisors allowed the CO Defendants to remain in circulation, on tier, and with close prisoner contact."  *Id.* ¶ 56.  As to Warden Dean, Addison alleges that, "on information and belief, [Warden Dean] knew that the CO Defendants were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to prisoners like Mr. Addison."  *Id.* ¶ 58.  And, according to Addison, "Warden Dean's response to that knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of these offensive practices."  *Id.*

In their Motion, defendants contend that plaintiff's only allegations against Warden Dean are "conclusory, generalized, and baseless statements" that "fail to satisfy any of [sic] requisite elements under *Shaw* [*v. Stroud*, 13 F.3d 791 (4th Cir. 1994), *cert. denied*, 513 U.S. 813 (1994)], to provide for supervisory liability . . . ."  ECF 23-1 at 12–13.  Plaintiff counters that he "has sufficiently alleged a supervisory liability claim against Warden Dean."  ECF 27 at 13.  He asserts that allegations made upon "information and belief" are "'generally appropriate where information is particularly within defendant knowledge and control.'"  *Id.* at 12 (quoting *Mann Bracken, LLP v. Exec. Risk Indem., Inc.,* DKC-15-1406, 2015 WL 5721632, at *7 (D. Md. Sept. 28, 2015) (internal citations omitted)).

The doctrine of respondeat superior does not apply in § 1983 cases.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).  Indeed, in § 1983 jurisprudence, "the term is a

misnomer." *Younger v. Crowder*, 79 F.4th 373, 381 n.12 (4th Cir. 2023) (citations omitted). This is because "'each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.'" *King v. Riley*, 76 F.4th 259, 269 (4th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 677); *see Bolick v. Anderson*, ___ F. 4th ___, 2026 WL 706427, at *8 (4th Cir. Mar. 13, 2026). Therefore, "'[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.'" *King*, 76 F.4th at 269 (quoting *Iqbal*, 556 U.S. at 676). If a plaintiff has not alleged any personal connection between a defendant and a denial of constitutional rights, the claim against that defendant must fail. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *see Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (same); *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (same).

Nevertheless, "'supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates.'" *Johnson v. Robinette*, 105 F.4th 99, 123 (4th Cir. 2024) (quoting *Shaw*, 13 F.3d at 798); *see Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013) (per curiam) ("A supervisor can only be held liable for the failings of a subordinate under certain narrow circumstances."). However, this supervisory liability "is not based on ordinary principles of *respondeat superior*, but rather . . . on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)); *see Campbell v. Florian*, 972 F.3d 385, 398 (4th Cir. 2020); *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014). "A supervisor who promulgates, directs, or oversees policies and practices that foreseeably inflict widespread constitutional injury cannot escape liability by hiding behind subordinates

responsible for implementing her commands." *Bolick*, 2026 WL 706427, at *8 (citing *Slakan*, 737 F. 2d at 376).

To state a claim for supervisory liability—which, at bottom, is just a species of personal liability—the plaintiff must allege facts, that, if proven, show (1) that "the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff . . . (2) that the supervisor's response to that knowledge was so inadequate . . . as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices' . . . and (3) that there was 'an affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Wilkins*, 751 F.3d at 226 (quoting *Shaw*, 13 F.3d at 799);[18] *see Bolick*, 2026 WL 706427, at *8; *Robinette,* 105 F.4th at 123; *Metcalf v. Geo Grp., Inc.*, 2024 WL 2827930, at *2 (4th Cir. June 4, 2024) (per curiam); *Griffin v. Mortier*, 837 Fed. App'x 166, 171–172 (4th Cir. 2020).

Regarding the first element, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm" requires allegations that "the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Shaw*, 13 F.3d at 799 (quoting *Slakan*, 737 F.2d at 373-74); *see Wilkins*, 751 F.3d at 226. Therefore, it is insufficient to point "to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence . . . nor can he reasonably be expected to guard against the deliberate [unlawful] acts

---

[18] In *Younger*, 79 F.4th at 384 n.16, the Court stated that it need not decide "whether or how much of the three-factor test from *Shaw* conflicts with *Iqbal* . . . ."

of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Shaw*, 13 F.3d at 799 (quoting *Slakan*, 737 F.2d at 373) (alteration inserted).

As to the second element, a supervisor's "continued inaction in the face of documented widespread abuses . . . provides an independent basis" for § 1983 liability against that official for his deliberate indifference or acquiescence to "the constitutionally offensive conduct of his subordinates." *Slakan*, 737 F.2d at 373; *see Shaw*, 13 F.3d at 799. With respect to the third element, "'proof of causation may be direct . . . where the policy commands the injury of which the plaintiff complains . . . or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions.'" *Wilkins*, 751 F.3d at 226-27 (quoting *Shaw*, 13 F.3d at 799).

In sum, a plaintiff must allege that a supervisor "acted or failed to act in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known." *Lewis v. Peterkin,* 2025 WL 3002826, at *1 (4th Cir. Oct. 27, 2025) (per curiam) (citing *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2631 (2024)) (internal quotation marks omitted in *Lewis*).

*Lee v. Queen Anne's County Office of The Sheriff*, RDB-13-672, 2014 WL 476233 (D. Md. Feb. 5, 2014), is instructive. There, a warrant was issued for Lee's arrest based on a police report stating that he had driven through a stop sign. *Id.* at *1. Upon learning of the warrant, Lee surrendered to law enforcement and was "briefly incarcerated before being released on bond that same day." *Id.* At trial, Lee maintained that he was not driving the car and that the car was not driven through a stop sign. *Id.* He was convicted of fraud, failure to stop, and driving with a revoked license. *Id.* However, a subsequent investigation revealed dashboard camera video evidence suggesting that the deputy who had written the police report and testified at Lee's trial

30

lied about the stop. *Id.* at *2. Moreover, the prosecutor purportedly concluded that, based on the evidence, there was no probable cause for the traffic stop. *Id.* As a result, the "charges" were subsequently *nol prossed. Id.*

Thereafter, Lee filed suit against the Queen Anne's County Office of the Sheriff. He alleged that the deputy's actions were "undertaken with malice and that he has suffered mental anguish, emotional pain and suffering, and financial loss as a result." *Id.* at *2. Further, Lee contended that the deputy "'acted with a wanton and reckless disregard for Plaintiff's civil rights by conducting an illegal traffic stop, causing an improper warrant to issue, [and] harassing Plaintiff and his family during a two-month period[.]'" *Id.* at *17 (quoting the amended complaint). And, pursuant to a theory of supervisory liability under § 1983, plaintiff sought to hold the Sheriff liable for the deputy's conduct. *Id.* at *8.

Lee alleged that the Sheriff "had constructive knowledge of his deputies' unconstitutional conduct" based on three incidents of prior conduct. *Id.* at *9 (quoting the amended complaint):

> a. On May 12, 2011, Queen Anne's County deputy John Dennis Hofmann pled guilty to second-degree assault after groping a woman inside his patrol car in August 2009. Deputy Hofmann is the brother of the Queen Anne's County Sheriff, Gary Hofmann. Hofmann remains employed by the Queen Anne's Office of the Sheriff[.]

> b. In August 2007, the Queen Anne's County Office of the Sheriff suspended three deputies for misconduct that occurred during a traffic stop. The misconduct concerned violations of departmental policies and procedures having to do with vehicle searches. After the investigation, all three deputies were reinstated even though two deputies had been found to have violated policies and procedures.

> c. On March 17, 2004, Queen Anne's County Deputy Sheriff Mark Barbre shot and paralyzed Andrew Pope, III during a traffic stop. Deputy Barbre had signaled for Pope to stop and pull over, but Pope continued to drive his vehicle until he reached his house, where he exited his vehicle and raised his hands in surrender. Deputy Barbre shot his firearm at Pope, striking him in the neck, paralyzing him.

31

The plaintiff insisted "that these allegations [were] sufficient to support his claim that [the Sheriff] had constructive knowledge of his deputies' unconstitutional conduct" and acted with deliberate indifference. *Id.* Urging dismissal, the Sheriff argued that the plaintiff relied too heavily on conclusory statements and lacked adequate factual detail to state a claim for supervisory liability. *Id.* at *8.

The *Lee* Court recognized that, to satisfy the first element of supervisory liability, the plaintiff "must allege pervasive unconstitutional conduct—*i.e.*, the conduct must be widespread or occurring on multiple occasions." *Id.* (internal quotation marks and citations omitted). Therefore, to state a claim, the plaintiff must identify "sufficient examples of past occurrences . . . ." *Id.* at *9. In effect, the question before the court in *Lee* was whether the "Amended Complaint contain[ed] sufficient examples of past occurrences to state a valid claim and avoid dismissal at this early stage of the litigation." *Id.* at *9. The *Lee* Court found that the allegations "present[ed] a close case," and ruled that plaintiff adequately pleaded a claim for § 1983 supervisory liability. *Id.*

In my view, Addison has not presented allegations adequate to nudge his supervisory liability claim against Warden Dean into plausible territory. Addison's allegations do not satisfy any of the requisite elements to establish such a claim. Moreover, his claim is couched in conclusory language, devoid of any factual detail to show that the "conduct is widespread, or at least has been used on several different occasions." *Shaw*, 13 F.3d at 799. Nor does plaintiff allege any facts to demonstrate that the Warden knew or had constructive knowledge that the correctional officers were "engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury" to inmates. *King,* 825 F.3d at 244.

Indeed, plaintiff presents no facts concerning Warden Dean's "continued inaction in the face of documented widespread abuses." *Wilkins*, 751 F.3d at 226 (citing *Shaw*, 13 F.3d at 799).

32

And, Addison fails to allege facts that, if proved, would establish an "affirmative causal link" between Warden Dean's alleged inaction and plaintiff's alleged constitutional injury. *Shaw*, 13 F.3d at 799; *see Metcalf*, 2024 WL 2827930, at *2 (affirming dismissal of supervisory liability claim because plaintiff failed to plausibly allege that defendant "was subjectively aware that medical personnel were engaged in conduct that posed a pervasive and unreasonable risk of indifference to or tacit authorization of the alleged offensive practices") (internal quotation marks omitted); *Griffin*, 837 Fed. App'x at 172 (affirming dismissal of supervisory liability claim when plaintiff failed to allege that supervisory defendants knew subordinates were engaged in conduct that posed a risk of constitutional injury).

Accordingly, I shall dismiss Count II, without prejudice, as to Warden Dean.

### C. Exhaustion of Remedies

### 1.

Defendants maintain that Count III (violations of Articles 16 and 25 of the Maryland Declaration of Rights), Count IV (negligent retention, training, and supervision), and Count V (malicious prosecution) are subject to dismissal because "plaintiff has failed to exhaust his administrative remedies," pursuant to the MPLA, C.J. §§ 5-1001 *et seq.* ECF 23-1 at 13; ECF 32 at 3.[19] They argue that "there is no record of Plaintiff filing an appeal of either ARP grievance with the Commissioner of Correction or the IIGO." ECF 23-1 at 15. Defendants also claim: "Plaintiff fails to allege that he filed a petition for judicial review as required by the MPLA." *Id.*

---

[19] As mentioned, plaintiff failed to specify in Count V whether the claim is based on State or federal law. But, in his Opposition, he claimed that he "brings his malicious prosecution claim in the alternative under both federal and state law." ECF 27 at 16. In their Reply, defendants contend that, "to the extent that Plaintiff's malicious prosecution claim is brought under State law[], it remains subject to the [MPLA]." ECF 32 at 3.

As discussed previously, in support of their position, defendants rely on the declarations of Donnelly and Taylor. *See* ECF 23- 3; ECF 23-4. However, for the reasons previously stated, I decline to consider the declarations at this juncture.

Plaintiff asserts that he is only required to exhaust administrative remedies as to Counts III and IV. ECF 27 at 13. But, he insists that he is not obligated to seek judicial review as to Counts III and IV because he never received a "final decision" from the IIGO. ECF 27 at 13–14.

As to Count V, plaintiff posits that his malicious prosecution claim, lodged against Asangong and Gray under State and federal law, does not concern his conditions of confinement. Therefore, he maintains that exhaustion of administrative remedies is not required under State law with respect to Count V. *Id.* at 13. And, he notes that the MPLA does not apply to a malicious prosecution claim under federal law. *Id.* at 17.

To address exhaustion for a Maryland prisoner asserting claims under Maryland law, the Court must consider two separate articles of the Maryland Code: the Correctional Services Article and the Courts and Judicial Proceedings Article. They must be harmonized. *See Adamson v. Corr. Med. Servs., Inc.*, 359 Md. 238, 252, 753 A.2d 501, 508 (2000) ("Our statutory construction analysis, therefore, requires an extensive restatement and integration of various sections of the [M]PLA [in the Courts Article] . . . and [the] Correctional Services Article . . . . Only after the statutory mosaic is pieced together, and placed in its proper context, can we gather a true picture of the scope of the [M]PLA's exhaustion requirement as it may apply to the case *sub judice.*").[20]

The MPLA, codified in the Courts Article, C.J. §§ 5-1001 *et seq.*, was enacted by the Maryland General Assembly in 1997 as a complement to the federal Prison Litigation Reform Act

---

[20] It appears to the Court that the parties did not attempt to reconcile the two separate articles of the Maryland Code.

("PLRA"), 42 U.S.C. § 1997e.  *See Harris v. McKenzie*, 241 Md. App. 672, 679, 211 A.3d 685, 689 (2019). The statute is intended to "discourage frivolous claims from burdening state government by inhibiting cases against the DOC and its officials and employees from entering the court system, thereby also saving judicial resources, and relieving the Attorney General from its obligation to defend those claims." *Adamson,* 359 Md. At 264, 753 A.2d at 515.

Of import, the MPLA applies to "Civil actions," which the MPLA defines as "legal action[s] seeking money damages, injunctive relief, declaratory relief, or any appeal filed in any court in the State that relates to or involves *a prisoner's conditions of confinement*."  C.J. § 5-1001(c)(1) (emphasis added).  Pursuant to C.J. § 5-1001(c)(2), a "Civil action" includes:

> (i)   An appeal of an administrative remedy to any court;
> (ii)  A petition for mandamus against the prisoner's custodian, its officers or employees, or any official or employee of the Department;
> (iii) Any tort claim against a custodian, the custodian's officers or employees, or any employee or official of the Department;
> (iv) Any action alleging a violation of civil rights against a custodian, the custodian's officers and employees, or any official or employee of the Department; or
> (v)  Any appeal, application for leave to appeal, or petition for certiorari.

As noted, the civil action must relate to or involve "a prisoner's conditions of confinement." C.J. § 5-1001(c)(1).  The MPLA defines "conditions of confinement" as "any circumstance, situation or event that involves a prisoner's custody, transportation, incarceration, or supervision." *Id.* § 5-1001(d).

Moreover, as discussed, *infra*, a prisoner must exhaust administrative remedies before filing a civil action. C.J. § 5-1003(a)(1).  The MPLA, C.J. § 5-1001(b)(1), defines "Administrative remedy."  It states that "Administrative remedy" is "any procedure for review of a prisoner's complaint or grievance, including judicial review, if available, that is provided by the [DPSCS],

the Division of Correction ["DOC"], or any county or other municipality . . . and results in a written determination or disposition."

Notably, C.J. § 5-1001(b)(2) references the Correctional Services Article. It provides: "'Administrative remedy' includes a proceeding under Title 10, Subtitle 2 of the State Government Article or Title 10, Subtitle 2 of the Correctional Services Article." S.G. §§ 10-201 *et seq.* provides for the resolution of contested cases pursuant to the Administrative Procedure Act. And, as discussed, *infra*, §§ 10-201 *et seq.* of the Correctional Services Article ("C.S.") of the Maryland Code (2025 Repl. Vol.) sets forth the administrative remedy procedure ("ARP") for use by Maryland State prisoners for "inmate complaint resolution." Title 10 of the Correctional Services Article is called "State Correctional Facilities", and Subtitle 2, referenced in C.J. § 5-1001(b)(2), is titled "Inmate Grievance Office."[21]

As mentioned, prior to the filing of a civil action, C.J. § 5-1003(a)(1) requires that "the prisoner has fully exhausted all administrative remedies for resolving the complaint or grievance." And,

C.J. § 5-1003(a)(2) provides that "an administrative remedy is exhausted when the prisoner has pursued to completion all appropriate proceedings for appeal of the administrative disposition, *including any available proceedings for judicial review*." (Emphasis added). C.J. § 5-1003(a)(3) is also pertinent. It states, in part: "Judicial review following administrative consideration shall be the exclusive judicial remedy for any grievance or complaint within the scope of the administrative process . . . ."

Further, the MPLA "*requires* the prisoner to attach proof of exhaustion of administrative remedies to his complaint." *Harris*, 241 Md. App. at 681, 211 A.3d at 690 (emphasis in original);

---

[21] The IGO has been replaced by the IIGO.

*see* C.J. § 5-1003(b). In this way, the MPLA is "more onerous" than its federal counterpart. *Evans v. State*, 396 Md. 256, 335, 914 A.2d 25, 72 (2006).

The MPLA states, in pertinent part, C.J. § 5-1003(b):

(1) When a prisoner files a civil action, the prisoner shall attach to the initial complaint proof that administrative remedies have been exhausted.

(2) The attachment shall include proof:

(i) That the prisoner has filed a complaint or grievance with the appropriate agency;
(ii) Of the administrative disposition of the complaint or grievance; and
(iii) That the prisoner has appealed the administrative disposition to the appropriate authority, including proof of judicial review, if available.

(3) On receipt of a prisoner's initial complaint that does not have attached to it proof that the prisoner has fully exhausted the administrative remedies available, the court shall dismiss the case without prejudice and grant the prisoner reasonable leave to amend the complaint and to provide the proof necessary to demonstrate that the prisoner has fully exhausted the administrative remedies.

Of import, "[i]n the absence of such proof, the court must dismiss the case, even if the administrative remedies have been exhausted and the only omission is the written proof of same." *Harris*, 241 Md. App. at 681, 211 A.3d at 690; *see* C.J. § 5-1003(c); *Jones v. Maryland*, DKC-19-1335, 2020 WL 433860, at *5 (D. Md. Jan. 28, 2020) ("[Plaintiff] failed to attach proof that administrative remedies have been exhausted and dismissal of the negligence claim is appropriate."); *Germain v. Bishop*, TDC-17-1289, 2018 WL 4518019, at *4 (D. Md. Sept. 19, 2018) (stating that failure to provide proof that administrative remedies have been exhausted "is grounds for dismissal.").

As indicated, the Administrative Remedy Procedure for Maryland prisoners is codified in C.S. §§ 10-201 *et seq.*; *see* C.S. § 10-206(a) (stating that the grievance procedure applies to the submission of a "grievance against an official or employee of the Division of Correction"). Regulations promulgated by DPSCS concerning the ARP contain Maryland's procedural rules for

exhaustion, and are found in COMAR 12.02.28, titled "Administrative Remedy Procedures to Resolve Inmate Complaints", and COMAR 12.07.01, titled "Inmate Grievance Office." *See*, *e.g.*, COMAR 12.02.28.02(B)(1) (defining ARP as "a formal process established by the Commissioner of Correction to address inmate complaints concerning conditions of confinement."); COMAR 12.02.28.05 (providing overview of inmate complaint resolution process); COMAR 12.02.28.09 (providing process for inmate requests for formal resolution of inmate complaints); COMAR 12.07.01.01(B)(1) (defining ARP as "the procedure established by the Commissioner for inmate complaint resolution."); COMAR 12.07.01.01(B)(8) (defining a "grievance" to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement."); COMAR 12.07.01.02 (providing general procedures for grievances filed with the IGO).

With respect to inmate grievances, Maryland has created a "three-step process . . . ." *Younger*, 79 F.4th at 379. For the first step, a prisoner is required to file his initial ARP with his facility's "managing official," COMAR 12.02.28.05(D), which is defined by COMAR 12.02.28.02(B)(14) as "the warden or other individual responsible for management of a correctional facility" and defined under C.S. § 1-101(m) as "the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B). The response from the managing official is due to the inmate within "30 calendar days of the date the inmate filed a formal complaint using the ARP." COMAR 12.02.28.12.H(3)(a).

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP or fails to respond to the ARP within the established time frame. The prisoner has 30 days to file an appeal to the Commissioner of Correction. COMAR 12.02.28.14(B)(5).

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the Incarcerated Individual Grievance Office, formerly known as the Inmate Grievance Office. C.S. §§ 10-206; COMAR 12.02.28.18; COMAR 12.07.01.02; COMAR 12.07.01.05(B). If the Commissioner fails to respond, the grievant shall file an appeal within 30 days of the date the response was due. COMAR 12.07.01.05(B)(2). When filing with the IIGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR 12.07.01.04(B)(9)(a).

If the grievance is determined to be "wholly lacking in merit on its face," the IIGO may dismiss it "without a hearing . . . ." C.S. § 10-207(b)(1); *see also* COMAR 12.07.01.06(B). An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IIGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings ("OAH"). *See* C.S. § 10-208; COMAR 12.07.01.07.08. The conduct of such hearings is governed by statute. *See* C.S. § 10-208; COMAR 12.07.01.07(D).

A decision of OAH denying all relief to the inmate is considered a final agency determination. C.S. § 10-209(b)(1)(ii); COMAR 12.07.01.10(A)(2). However, if OAH concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within

39

fifteen days after receipt of the proposed decision of the administrative law judge. *See* C.S. § 10-209(b)(2),(c); COMAR 12.07.01.10(B); *see also* S.G. §§ 9-1601, *et seq.* The Secretary's order constitutes the final decision for purposes of judicial review. C.S. § 10-209(3)(ii).

The Correctional Services Article, like the Courts Article, also provides for judicial review. *See* C.S. § 10-210; C.J. § 5-1003. C.S. § 210(a) provides: "A court may not consider an individual's grievance that is within the jurisdiction of the [IIGO] or the [OAH] unless the individual has exhausted the remedies provided in this subtitle." C.S. § 10-210(b)(1) states: "The complainant is entitled to judicial review of the *final decision* of the Secretary [of DPSCS] under § 10-207(b)(2)(ii) or § 10-209(b)(1)(ii) or (c)(3)(ii) of this subtitle." (Emphasis added).

The statutory scheme also clarifies what constitutes a "final decision . . . for purposes of judicial review," depending on possible outcomes: dismissal after preliminary review by the IIGO (C.S. § 10-207(b)(2)(ii)); dismissal by OAH (C.S. § 10-209(b)(1)(ii)); the Secretary's affirmance, reversal, modification, or remand of the OAH order (C.S. § 10-209(c)(3)(ii)).

Of significance, the ARP process does not apply to complaints relating to prisoner disciplinary procedures and decisions. COMAR 12.02.28.04(B)(3). If a prisoner is found guilty of a rule violation, the prisoner is entitled to appeal the hearing officer's guilty decision or sanction to the warden of the facility where he or she is incarcerated. COMAR 12.03.01.30(A). If the prisoner does not file a written appeal with the warden within fifteen days of receipt of the hearing officer's decision, the prisoner is considered to have waived the right to appeal. COMAR 12.03.01.30(A)(3)(b).

A prisoner may appeal the warden's decision to the IIGO, as provided in COMAR 12.03.01.30(C). It states: "A defendant may appeal the managing official's decision to the [IIGO] as provided under COMAR 12.07.01.05 and 12.07.01.08." When filing an appeal with the IIGO,

the prisoner is required to include a copy of the initial notice of inmate rule violation, the hearing record, the appeal to the warden, and the warden's response to the appeal. COMAR 12.07.01.04(B)(9)(b).

**2.**

As discussed, plaintiff asserts as to Count V that he "brings his malicious prosecution claim in the alternative under both federal and state law." ECF 27 at 16. To the extent that the malicious prosecution claim against Asangong and Gray is brought pursuant to Maryland law, he argues that the claim is not subject to the MPLA because it does not concern conditions of confinement. ECF 27 at 16. And, as noted, Addison maintains that the MPLA is wholly inapplicable to a malicious prosecution claim brought under federal law. *See Adamson*, 359 Md. at 264, 753 A.2d at 515. I agree with both contentions.

Addison's malicious prosecution claim seeks to hold Asangong and Gray liable for "falsely, maliciously, and without probable cause, caus[ing] an Application for Statement of Charges to be sworn out against Mr. Addison for two counts of second-degree assault, one as to CO Asangong and the other as to CO Gray." ECF 7, ¶ 80. According to plaintiff, the Application falsely stated, among other things, that Addison struck Asangong in the face and kicked Gray in the torso. *Id.* (internal citations omitted).

To be sure, Addison's alleged assaults of the correctional officers, which led to the filing of the Statement of Charges against him, occurred during plaintiff's incarceration at JCI. *Id.* ¶ 39. But, that does not transform the matter to one concerning conditions of confinement. And, as noted, the MPLA applies to "legal action[s] . . . filed in any court in the State that relates to or involves a prisoner's conditions of confinement." C.J. § 5-1001(c). "Conditions of confinement"

41

are defined as "any circumstance, situation or event that involves a prisoner's custody, transportation, incarceration, or supervision." C.J. § 5-1001(d).

Moreover, C.S. § 10-206(a) provides for the submission of a grievance by an inmate to the IIGO. As indicated, a "grievance" is defined to include an inmate's complaint "arising from the circumstances of custody or confinement." COMAR 12.07.01.01(B)(8).

Plaintiff cites COMAR 12.02.28.04 to support his contention that the malicious prosecution claim is "outside the scope of the MPLA." ECF 27 at 16. It is titled "Conditions of Confinement Subject to the ARP." The provision lists various categories that an inmate "may" or "may not use the ARP to resolve." COMAR 12.02.28.04 does not explicitly indicate whether plaintiff's malicious prosecution claim is covered by the ARP or the MPLA. However, it states: "An inmate may not use the ARP to resolve a complaint concerning . . . Inmate disciplinary hearing procedures and decisions." COMAR 12.02.28.04(B)(3).

Defendants cite *Head v. Rakowski*, 695 F. Supp. 3d 663, 682 (D. Md. 2023), to support their contention that a claim of malicious prosecution is subject to the exhaustion requirements. *See* ECF 32 at 4. In *Head*, according to defendants, "Judge Bredar found that a claim asserting malicious prosecution arising from the alleged actions of a correctional officer while a plaintiff is incarcerated is subject to exhaustion requirements under the Federal Tort Claims Act ["FTCA"]." *Id.* But, the FTCA does not contain language restricting the types of torts to which it applies, whereas the MPLA expressly describes matters within its ambit. And, defendants do not provide any authority to establish that construction of the FTCA is applicable to the MPLA.

Given that the MPLA was enacted to complement the PLRA, the Supreme Court's interpretation of the PLRA provides guidance. *See Harris*, 241 Md. App. at 679, 211 A.3d at 689. The Supreme Court has interpreted the reach of the PLRA broadly, concluding that the phrase

42

"prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).  Similarly, the MPLA was broadly drafted to include *"*any circumstance, situation or event that involves a prisoner's custody, transportation, incarceration, or supervision."  C.J. § 5-1001(d).  The malicious prosecution claim does not fall within that description.

To the contrary, the Maryland General Assembly explicitly limited the reach of the MPLA to "conditions of confinement."  C.J. § 5-1001(c).  As I see it, the malicious prosecution claim does not concern a condition of confinement.

I decline to expand the scope of the MPLA to encompass Addison's malicious prosecution claim, lodged under Maryland law.  Therefore, the claim is not subject to the State's exhaustion requirements.  And, to the extent that plaintiff's malicious prosecution claim is founded on federal law, the MPLA exhaustion requirement is simply inapplicable.

**3.**

I turn to defendants' contention that plaintiff has not complied with the administrative exhaustion requirements of the MPLA with respect to Count III (violations of Articles 16 and 25 of the Maryland Declaration of Rights) and Count IV (negligent training and supervision).

Notably, defendants do not contend that plaintiff has failed to *allege* exhaustion.  ECF 23-1 at 15.  Indeed, defendants note: "Plaintiff alleges that he filedtwo [sic] ARP grievances, an appeal to the Commissioner of Correction and an appeal to the IIGO."  *Id.* (citing ECF 7 at 12).  Instead, defendants complain that plaintiff has not attached to his Amended Complaint proof of administrative exhaustion, as required by C.J. § 5-1003(b).  *See* ECF 23-1 at 15.  In addition,

defendants complain that plaintiff failed to exhaust administrative remedies through State judicial review. ECF 23-1 at 14.

Addison maintains that he "filed a timely appeal to the Warden, but the Warden never responded. Mr. Addison then filed a timely appeal to the IIGO, which similarly has failed to respond." ECF 7, ¶ 48. Addison also points out that, under the MPLA, "an administrative remedy is exhausted when the prisoner has pursued to completion all appropriate proceedings for appeal of the administrative disposition, *including any available proceedings for judicial review*." C.J. § 5-1003(a)(2) (emphasis added). According to plaintiff, judicial review was not available to him because he never received a "final decision" from the IIGO. *See* C.S. § 10-210(b)(1).

As discussed, plaintiff submitted exhibits with his suit — the December 17, 2023 ARP (ECF 1-3 at 26–29) and the January 12, 2024 ARP (ECF 1-3 at 30–34). Moreover, he submitted the Addison Declaration, in which he avers that he filed timely appeals to both the Warden and the IIGO, but neither responded. ECF 1-3 at 37; *see also* ECF 7, ¶ 48. Further, Addison avers that he does not have documentation of his appeals because his records were taken by Lieutenant Boddi and Sergeant Kanu during a search of his cell on September 18, 2024. ECF 1-3 at 37, 38; ECF 7, ¶¶ 48, 49.

Defendants, in turn, submitted two declarations with their Motion, which contradict plaintiff's allegations. *See* ECF 23-3; ECF 23-4. But, as previously discussed, the Court may not consider the declarations in connection with the Motion, as they are neither "explicitly incorporated into the complaint by reference" or "integral to the complaint." *Goines,* 822 F.3d at 165–66.

As discussed, the MPLA provides: "A prisoner may not maintain a civil action until the prisoner has fully exhausted all administrative remedies for resolving the complaint or grievance."

44

C.J. § 5-1003(a)(1). And, "[a]n administrative remedy is exhausted when the prisoner has pursued to completion all appropriate proceedings for appeal of the administrative disposition, *including any available proceedings for judicial review*." C.J. § 5-1003(a)(2) (emphasis added). Moreover, "[j]udicial review following administrative consideration shall be the exclusive judicial remedy for any grievance or complaint within the scope of the administrative process, unless the prisoner's complaint or grievance was found to be meritorious and monetary damages were not available through the administrative remedy available to the prisoner." C.J. § 5-1003(a)(3).

C.S. § 10-210(a) is also pertinent. It states: "A court may not consider an individual's grievance that is within the jurisdiction of the [IIGO] or the [OAH] unless the individual has exhausted the remedies provided in this subtitle."[22] And, as stated earlier, C.S. § 10-210(b)(1) provides: "The complainant is entitled to judicial review of the *final decision* of the Secretary [of DPSCS] under § 10-207(b)(2)(ii) or § 10-209(b)(1)(ii) or (c)(3)(ii) of this subtitle." (Emphasis added). Moreover, the statutory scheme clarifies what constitutes a "final decision . . . for purposes of judicial review," depending on possible outcomes: dismissal after preliminary review by the IIGO (C.S. § 10-207(b)(2)(ii)); dismissal by OAH (C.S. § 10-209(b)(1)(ii)); the Secretary's affirmance, reversal, modification, or remand of the OAH order (C.S. § 10-209(c)(3)(ii)).

To construe the many statutory provisions that I have set forth, principles of statutory construction are helpful. The Fourth Circuit has instructed that, when interpreting a State statute, the federal court must "stand in the shoes of Maryland's courts" and "'look to the rules of construction applied by [Maryland's] highest court.'" *United States v. Lierman*, 151 F.4th 530, 536 (4th Cir. 2025) (quoting *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am.*, 492 F.3d

---

[22] The provision does not cross-reference provisions in the MPLA, set forth in the Courts and Judicial Proceedings Article. And, of course, the MPLA is not contained in "this subtitle."

484, 489 (4th Cir. 2007)); *see In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009). Notably, Maryland "follows the general principles of statutory interpretation." *Johnson v. Mayor & City Council of Balt.*, 430 Md. 368, 377, 61 A.3d 33, 38 (2013).  Therefore, I shall reference both federal and Maryland cases.

"The goal of statutory construction is to discern and carry out the intent of the Legislature." *Blue v. Prince George's County*, 434 Md. 681, 689, 76 A.3d 1129, 1133 (2013); *see Williams v. Peninsula Regional Medical Center*, 440 Md. 573, 580, 103 A.3d 658, 663 (2014) ("'The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature.'") (citation omitted); *Lockshin v. Semsker*, 412 Md. 257, 274, 987 A.2d 18, 28 (2010) ("The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature."). "To ascertain the intent of the General Assembly," the Court "begin[s] with the normal, plain meaning of the language of the statute." *Lockshin*, 412 Md. at 275, 987 A.2d at 28; *see Breslin v. Powell*, 421 Md. 266, 286, 26 A.3d 878, 891 (2011) ("In attempting to discern the intent of the Legislature, courts 'look first to the plain language of the statute, giving it its natural and ordinary meaning.'") (citation omitted).

If the language of the statute is "clear and unambiguous, courts will give effect to the plain meaning of the statute and no further sleuthing of statutory interpretation is needed." *Breslin*, 421 Md. at 286–87, 26 A.3d at 891.  But, if a statutory term is not defined, it is "'proper to consult a dictionary or dictionaries for a term's ordinary and popular meaning.'" *Montgomery County v. Deibler*, 423 Md. 54, 67, 31 A.3d 191, 198 (2011) (citation omitted).

Courts "'do not read statutory language in a vacuum,'" nor do they "'confine [their] interpretation of a statute's plain language to the isolated section alone.'" *Williams*, 440 Md. at 580-81, 103 A.3d at 663 (citation omitted) (alteration added); *see Gundy v. United States,* 588 U.S.

128, 129 (2019); *United States v. Bryant*, 949 F.3d 168, 175-76 (4th Cir. 2020); *Williams v. Morgan State Univ.,* 484 Md. 534, 551, 300 A.3d 54, 64 (2023). Rather, the plain language of a statute "'must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.'" *In re J.C.N.*, 460 Md. 371, 391, 190 A.3d 329, 341 (2018) (citation omitted); *see In re St. Andrews United Methodist Church*, 2023 WL 386177, at *4 (Md. Ct. Spec. App. Jan. 25, 2023).

Moreover, the statute must be read "'as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'" *Conaway v. State*, 464 Md. 505, 523, 212 A.3d 348, 358 (2019); *see Andrews & Lawrence Pro. Servs., LLC v. Mills*, 467 Md. 126, 149, 223 A.3d 947, 960 (2020); *Bourgeois v. Live Nation Ent's, Inc.*, 430 Md. 14, 27, 59 A.3d 509, 516 (2013). And, courts may "'neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute.'" *McCloud v. Dep't of State Police, Handgun Permit Review Bd.*, 426 Md. 473, 480, 44 A.3d 993, 997 (2012) (citation omitted).

Notably, a court should strive to "avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense." *Bellard v. State*, 452 Md. 467, 481-82, 157 A.3d 272, 280-81 (2017); *see also Breck v. Maryland State Police*, 452 Md. 229, 248, 156 A.3d 858, 869 (2017); *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 351, 36 A.3d 399, 409 (2012). When one interpretation of statutory language would produce such a result, a court will reject that interpretation in favor of one that does not suffer the same flaw. *See Bell v. Chance*, 460 Md. 28, 53, 188 A.3d 930, 944 (2018).

With these principles in mind, I return to the administrative exhaustion requirements applicable here. A prisoner must follow all the steps in the administrative process, to the extent

47

applicable. Moreover, a plaintiff must pursue to completion "any available proceedings for judicial review." C.J. § 5-1003(a)(2). If an inmate is not satisfied with the action of the IIGO in response to his complaint, the Maryland General Assembly has provided for judicial review by way of an appeal to the circuit court for the county in which the correctional institution is located. C.S. § 10-210; C.J. § 5-1003(a).[23] But, a plaintiff may only pursue judicial review of a *final agency decision*. *See* C.S. § 10-210; *Fishback v. Maryland*, LKG-22-00833, 2023 WL 1995411, at \*5 (D. Md. Feb. 14, 2023) ("Because Plaintiff failed to seek such judicial review [of the OAH's final decision], he has not exhausted administrative remedies for this claim as required by the [M]PLA."); *Nolan v. Nines*, 2022 WL 17364743, at \*3 (Md. Ct. Spec. App. Dec. 1, 2022) (per curiam) ("Such a dismissal [by the circuit court] constituted the final decision for the purposes of judicial review."); *Harris*, 241 Md. App. at 681, 211 A.3d at 690 ("Because Appellant could not provide any proof of judicial review due to his failure to properly appeal the IGO's decision, Appellant did not 'fully exhaust all administrative remedies.'").

Here, plaintiff alleges that he did not receive a final agency action. The defense casts blame on plaintiff, asserting that he did not exhaust and therefore did not obtain a final agency decision. But, in the Amended Complaint, plaintiff explains the reason for the lack of a final agency action. ECF 7, ¶ 48. And, in the absence of a final agency decision, plaintiff contends that judicial review was not "available" to him, within the meaning of C.J. § 5-1003(a)(2). ECF 27 at 11.

The PLRA, on which the MPLA was based, requires a federal inmate to exhaust "available" remedies. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions

---

[23] Under the PLRA, which applies to federal claims, an inmate is not required to seek state judicial review in order to satisfy the administrative exhaustion requirement. *See Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement so that the agency addresses the merits of the claim, but need not seek judicial review), *cert. denied*, 537 U.S. 949 (2002).

under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility *until such administrative remedies as are available are exhausted*.") (Emphasis added); *see Ross v. Blake*, 578 U.S. 632, 639 (2016); *Jones v. Bock*, 549 U.S. 199, 220 (2007). Administrative exhaustion under 42 U.S.C. § 1997e(a) is not a jurisdictional requirement, however. Rather, it is an affirmative defense to be pleaded and proven by the defendant. *Bock*, 549 U.S. at 215-16; *Gowen v. Winfield*, 130 F.4th 162, 176 (4th Cir. 2025); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

In *Ross*, 578 U.S. at 635, the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id.* at 638. But, the Court reiterated: "A prisoner need not exhaust remedies if they are not 'available.'" *Id.* at 642. *Ross* recognized that there are circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust "does not come into play." *Id.* at 643. One such circumstance is when "prison administrators thwart inmates from taking advantage of a grievance process . . . ." *Id.* at 644; *see also Gowen*, 130 F.4th at 176.

The Fourth Circuit addressed the meaning of "available" remedies in *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). The Court stated that "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." (Citations omitted). But, the Fourth Circuit also said, *id.* (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)): "Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies 'in accordance with the applicable procedural rules,' so

49

that prison officials have been given an opportunity to address the claims administratively. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond."

Merriam Webster's Dictionary defines "available" as, *inter alia*, "present or ready for immediate use" and "accessible, obtainable." *Available*, Merriam Webster, available at https://perma.cc/K7XT-ZCGM. Pursuant to C.J. § 5-1003(a)(2) and C.S. § 10-210(a), reading the statutory schemes as a whole, and using the ordinary and plain meaning of the term "available," judicial review was not "accessible" to plaintiff because he lacked a "final decision" from the agency, as defined by C.S. § 10-210(b)(1). And, he did not have key documents in his possession that were required under C.J. § 5-1003(a)(2) to pursue judicial review.

Taking Addison's allegations as true, as I must in the context of Rule 12(b)(6), Addison alleges that he filed timely appeals to both the Warden and the IIGO. ECF 7, ¶ 48. But, he asserts that he never received a final decision from the IIGO. *Id.* As the Fourth Circuit put it in *Moore*, 517 F.3d at 725, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it."

It is also worth noting that, if I were to accept defendants' position that the State law claims must be dismissed for failure to seek judicial review, plaintiff would be forced to pursue his claims in a piecemeal fashion, which courts generally do not favor. In particular, the malicious prosecution claim is not subject to the MPLA. And, the limitations clock is running on claims that are not subject to the MPLA. So, plaintiff would have to litigate that claim while pursuing a final agency decision for other claims, followed by judicial review. Such a bifurcated approach would be inefficient and a burden on judicial resources. *See*, *e.g.*, *Lee v. Norfolk S. Ry. Co.,* 802 F.3d 626, 635 (4th Cir. 2015) ("All claims arising out of a single wrong must be presented in one

50

action.") (internal quotation marks omitted) (cleaned up); *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 273 F. App'x 256, 265 (4th Cir. 2008) (per curiam) (The claim splitting doctrine prohibits a party "from prosecuting its case piecemeal and requires that all claims arising out of a single wrong be presented in one action."); *Fleming v. Bank of England*, No. PX-24-01823, 2025 WL 1707275, at *3 (D. Md. June 17, 2025) ("A plaintiff cannot litigate his case piecemeal.").

At this juncture, as to Count III, Count IV, and Count V, I shall deny defendants' Motion with respect to exhaustion under the MPLA. The denial is without prejudice to the right of defendants to renew their exhaustion contention at a later time.

## D. Maryland Tort Claims Act

### 1.

Defendants urge the Court to dismiss Counts III, IV, and V for failure to comply with the MTCA. As previously noted, Addison clarified in his Opposition that he has lodged his malicious prosecution claim under both federal and State law. ECF 27 at 16. In their Reply, defendants note that, "to the extent Count V of the Amended Complaint is brought under State law, it should be dismissed with prejudice" due to plaintiff's failure to comply with the MTCA. ECF 32 at 8.

Defendants argue that dismissal of Count III, Count IV, and Count V under State law is warranted because plaintiff failed to comply with S.G. § 12-106(b)(2), which prohibits a claimant from pursuing an action under the MTCA unless "'the Treasurer or designee has denied the claim finally.'" ECF 23-1 at 18–19 (quoting S.G. § 12-106(b)(2)). Defendants assert: "The Maryland State Treasurer has not denied Plaintiff's claim related to the incident that is the subject of this suit to date. In fact, the Treasurer suspended its investigation into his claim until there was a decision rendered by the IIGO." ECF 23-1 at 19 (citing ECF 1-3 at 25).

51

As to Counts IV and V, defendants also contend that Addison "has failed to provide the required notice under the [MTCA]." ECF 23-1 at 17; *see* ECF 32 at 8–9. [24] They assert that plaintiff's notice to the Treasurer on April 17, 2024, was insufficient because it "makes no mention of any facts giving rise to Plaintiff's claims for negligent training against DPSCS or malicious prosecution against Defendants Asangong and Gray . . . ." ECF 23-1 at 18 (citing ECF 1-3 at 22).

In addition, defendants argue that, as to Count V, to the extent it is based on State law, plaintiff did not adequately allege malice, so as to take the claim outside the parameters of the MTCA. ECF 32 at 7–8.

The MTCA offers "a limited waiver of sovereign immunity and 'is the sole means by which the State of Maryland and its personnel may be sued in tort.'" *Paulone v. City of Frederick*, 718 F. Supp. 2d 626, 637 (D. Md. 2010) (citation omitted); *see Condon v. Md.-Univ. of Md.*, 332 Md. 481, 492, 632 A.2d 753, 758 (1993); *Mitchell v. Hous. Auth. of Balt. City*, 200 Md. App. 176, 201–02, 26 A.3d 1012, 1027–28 (2011).

S.G. § 12-104, titled "Waiver of Immunity," provides, in part (italics in original):

(a) *In general.* — (1) Subject to the exclusions and limitations in this subtitle and notwithstanding any other provision of law, the immunity of the State and of its units is waived as to a tort action, in a court of the State, to the extent provided under paragraph (2) of this subsection.

. . .

(b) Immunity is not waived under this section as described under § 5-522(a) of the Courts and Judicial Proceedings Article.

---

[24] Defendants do not argue for dismissal of Count III on these grounds, presumably because defendants concede that plaintiff's Notice of Claim to the Treasurer contained adequate facts to provide sufficient notice as to his claim asserting violations of Articles 16 and 25 of the Maryland Declaration of Rights. *See* ECF 23-1 at 15–16.

S.G. § 12-105 is titled "Immunity of State personnel."  It provides, *id.*: "State personnel shall have the immunity from liability described under § 5-522(b) of the Courts and Judicial Proceedings Article."

C.J. § 5-522 is titled "Immunity—State and its personnel and units." C.J. § 522(a) provides, in part: "Immunity of the State is not waived . . . for . . . 4) Any tortious act or omission of State personnel that: (i) Is not within the scope of the public duties of the State personnel; or (ii) Is made with malice or gross negligence . . . ."

C.J. § 5-522(b) is also pertinent.  It provides: "*In general.* — State personnel . . . are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and for which the State or its units have waived immunity under Title 12, Subtitle 1 of the State Government Article, even if the damages exceed the limits of that waiver." *See Cooper v. Rodriguez*, 443 Md. 680, 707, 118 A.3d 829, 845 (2015).

"The Court of Appeals of Maryland[25] has observed that, when read in tandem, [S.G. § 12-104 and C.J. § 5-522] establish that the tort 'liability of the State and [the tort] liability of individual State personnel are mutually exclusive. If the State is liable, the individual is immune; if the individual is liable, the State is immune.'" *Marks v. Dann*, DKC-13-0347, 2013 WL 8292331, at *7 (D. Md. July 24, 2013) (second alteration in *Marks*) (quoting *Newell v. Runnels*, 407 Md. 578,

---

[25] In the Maryland general election in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland.  And, the voters also approved a change in the name of the State's intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022.  *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR.  I shall refer to the courts by the names that were in effect when the cited decisions were issued.

635, 967 A.2d 729, 763 (2009)), *aff'd*, 600 F. App'x 81 (4th Cir. 2015) (per curiam). And, under Maryland law, wardens and correctional officers are considered State personnel. *Cooper*, 443 Md. at 713 n.13, 118 A.3d at 849 n. 13 ("[A] correctional officer employed by the Division of Correction of the Maryland DPSCS[ ] is a State employee for purposes of the MTCA and also a public official for purposes of common law public official immunity.").

The "MTCA does not distinguish between constitutional torts and common law torts. *See*, *e.g.*, *Lee v. Cline*, 384 Md. 245, 256, 863 A.2d 297, 303–304 (2004) (constitutional torts); *Okwa v. Harper*, 360 Md. 161, 180, 757 A.2d 118, 128 (2000) (false imprisonment, malicious prosecution, intentional infliction of emotional distress); *Sawyer v. Humphries*, 322 Md. 247, 261-62, 587 A.2d 467, 474 (1991) (battery). "Accordingly, the same standards of malice and gross negligence govern" State common law tort claims and violations of State constitutional rights. *Newell*, 407 Md. at 640 n. 28, 967 A.2d at 766 n. 28. Moreover, statutory immunity under the MTCA applies to both negligent and intentional torts. *See Lee*, 384 Md. at 266, 863 A.2d at 310; *see also Espina v. Jackson*, 442 Md. 311, 325, 112 A.3d 442, 450 (2015).[26]

The MTCA establishes a notice requirement for claims brought pursuant to the statute. *See Gray v. Maryland*, 228 F. Supp. 2d 628, 641 (D. Md. 2002) ("In order for a plaintiff to bring a claim against the State or a state officer under the MTCA, certain notice requirements must be met."). In general, filing a notice of claim with the State Treasurer is a "condition precedent to bringing an action under the MTCA." *Id.; see Renn v. Bd. of Comm'rs of Charles Cnty.*, 352 F. Supp. 2d 599, 603 (D. Md. 2005) (construing Local Government Tort Claims Act)

---

[26] Statutory immunity under the MTCA is distinct from Maryland's common law doctrine of public official immunity, which "is generally applicable only in negligence actions or defamation actions based on allegedly negligent conduct." *Lee*, 384 Md. at 258, 863 A.2d at 305.

("LGTCA").[27]  This requirement "affords the State the opportunity to investigate the claims while the facts are fresh and memories vivid, and, where appropriate, settle them at the earliest possible time."  *Haupt v. State*, 340 Md. 462, 470, 667 A.2d 179, 183 (Md. 1995); *see* COMAR 25.02.03.01(A)(1).

The notice requirement contained in the MTCA states, in part, S.G. § 12-106(b):

(b) *Claim and denial required.*—Except as provided in subsection (c) of this section, a claimant may not institute an action under this subtitle unless:

(1) the claimant submits a written claim to the Treasurer or a designee of the Treasurer within 1 year after the injury to person or property that is the basis of the claim;

(2) the Treasurer or designee denies the claim finally; and

(3) the action is filed within 3 years after the cause of action arises.

In *Hansen v. City of Laurel*, 420 Md. 670, 25 A.3d 122 (2011), an LGTCA case, the Maryland Court of Appeals said: "A plaintiff must not only satisfy the notice requirement strictly or substantially, but also plead such satisfaction in his/her complaint. If a plaintiff omits this step, he or she is subject to a motion to dismiss, for instance, based on a failure to state a claim upon which relief can be granted." *Id.* at 694, 25 A.3d at 137.

However, "two corollary principles soften[] strict compliance with the MTCA's notice provisions." *Andrews v. Maryland Dep't of Pub. Safety & Corr. Servs.*, JMC-23-0172, 2024 WL 520038, at *9 (D. Md. Feb. 9, 2024).  "First, 'the Maryland General Assembly amended the

---

[27] Although the LGTCA and MTCA are not identical, analysis of one statute informs analysis of the other. Indeed, the Maryland Court of Appeals has drawn comparisons between the LGTCA and MTCA. *See, e.g.*, *Espina*, 442 Md. at 324, 112 A.2d at 450 (drawing on analysis of the MTCA to find that the LGTCA "appears to encompass constitutional torts"); *Bd. of Educ. of Prince George's Cnty. v. Marks–Sloan*, 428 Md. 1, 29–30, 50 A.3d 1137, 1154–55 (2012) (using both statutes for guidance to interpret Maryland law governing county boards of education); *see also Heron v. Strader*, 361 Md. 258, 263, 761 A.2d 56, 58–59 (2000).

55

MTCA in 2015 to permit substantial compliance[, which] entails a communication that provides the State requisite and timely notice of facts and circumstances giving rise to the claim.'" *Id.* (quoting *McDaniel v. Maryland*, RDB-10-0189, 2010 WL 3260007, at *3 (D. Md. Aug. 18, 2010)). Specifically, the MTCA provides: "If a claimant fails to submit a written claim . . . , on motion by a claimant and for good cause shown, the court may entertain an action under this subtitle unless the State can affirmatively show that its defense has been prejudiced by the claimant's failure to submit the claim." S.G. § 12-106(c)(1). Further, it provides that the notice requirement "does not apply if, within 1 year after the injury to person or property that is the basis of the claim, the State has actual or constructive notice of: (i) the claimant's injury; or (ii) the defect or circumstances giving rise to the claimant's injury." S.G. § 12-106(c)(2).

Second, in a suit against individual State personnel in which it is sufficiently alleged that the defendants acted with malice or gross negligence, compliance with the MTCA's notice requirement is not necessary. *See Barbre v. Pope*, 402 Md. 157, 173, 935 A.2d 699, 714 (2007); *see also Andrews*, 2024 WL 520038, at *9 ("[T]he MTCA's notice requirement is not a prerequisite to filing suit where a plaintiff's complaint sufficiently alleges malice or gross negligence.") (citation and internal quotation marks omitted) (cleaned up); *Taylor v. Somerset Cnty. Commissioners*, RDB-16-0336, 2016 WL 3906641, at *5 (D. Md. July 19, 2016) ("To defeat this immunity, a plaintiff must sufficiently allege that the state personnel acted with malice or gross negligence.") (internal quotation marks and citation omitted) (cleaned up); *see Ford v. Balt. City Sheriff's Office*, 149 Md. App. 107, 133, 814 A.2d 127, 142 (2002) ("[T]he MTCA permits suit against the State for a negligent violation of the State Constitution by State personnel, but State personnel shall be immune from such suits.").

The doctrine of substantial compliance is "narrowly construed," however. *McDaniel,* 2010 WL 3260007, at *4. Nor does the substantial compliance doctrine provide "license to ignore the clear mandate" of the MTCA. *Chinwuba v. Larsen*, 142 Md. App. 327, 355, 790 A.2d 83, 98 (2002*), rev'd on other grounds*, 377 Md. 92, 832 A.2d 193 (2003). Indeed, "[t]he doctrine of substantial compliance has no application to an outright failure to comply . . . ." *Simpson v. Moore*, 323 Md. 215, 228, 592 A.2d 1090, 1096 (1991).

**2.**

Defendants urge dismissal of Counts III, Count IV, and Count V (to the extent lodged under State law), based on plaintiff's failure to comply with S.G. § 12-106(b)(2).

S.G. § 12-106(b)(2) provides that "a claimant may not institute an action under [the MTCA] unless . . . the Treasurer or designee denies the claim finally." According to defendants, the Treasurer has not denied plaintiff's claim related to the incident on December 14, 2023. ECF 23-1 at 19. Rather, the Treasurer *suspended* the processing of the matter, without a final decision. *Id.*; ECF 32 at 10–11. And, according to defendants, the Treasurer had the administrative authority to do so, pursuant to COMAR 25.02.05.02(A). ECF 32 at 10. In that circumstance, defendants note that the Treasurer "must direct the incarcerated individual to file a complaint with the IIGO," which is what the Treasurer did. *Id.* (citing COMAR 25.02.05.02(B)(1)).

Plaintiff counters that the "MTCA further provides that a claim is 'denied finally' 'if the Treasurer or designee fails to give notice of a final decision within 6 months after the filing of the claim.'" ECF 27 at 21 (quoting S.G. § 12-107). Plaintiff complains that the State Treasurer imposed an "extra-textual obligation" on him by "demanding documentation from the IGO." ECF 27 at 20.

On April 23, 2024, plaintiff received a letter from the Maryland State Treasurer's Office, which plaintiff attached to his Complaint, acknowledging receipt of his claim. *See* ECF 1-3 at 25.[28] The representative from the Treasurer's Office wrote, in part, *id.*:

> Before the Treasurer's Office considers a claim filed by persons confined in an institution within the Division of Corrects, we require that you file a complaint with the Inmate Grievance Office (IGO), with a copy of this letter. Our decision on this matter will be stayed pending the Treasurer's receipt of the decision from the IGO.
>
> If your complaint is dismissed by the IGO as wholly lacking in merit, we will proceed to process your claim, upon receipt of notification from IGO, in accordance with COMAR 25.02.03.

COMAR 25.02.05.02(A) provides: "When an inmate files a claim with the Treasurer, the Treasurer may suspend claims processing pending receipt of the decision of the Inmate Grievance Commission issued pursuant to COMAR 12.07.01." COMAR 12.07.01 contains DPSCS's IIGO General Regulations. The Treasurer's decision to suspend plaintiff's claim pending a decision from the IIGO was administratively justified.

But, as plaintiff points out, S.G. § 12-107(d)(2) makes clear that a claim is "denied finally" "if the Treasurer or designee fails to give notice of a final decision within 6 months after the filing of the claim." Here, plaintiff submitted his Notice of Claim to the Treasurer on April 17, 2024. ECF 1-3 at 25. Six months passed without plaintiff's receipt of a final decision. Thus, the Treasurer's failure to respond within the time provided by statute constitutes a final denial.

In *State v. Harris*, 327 Md. 32, 35, 607 A.2d 552, 553 (1992), the Maryland Court of Appeals emphasized that the language of the MTCA "provides that an action may not be

---

[28] Curiously, plaintiff contends that "the Treasurer's Office cites no legal authority for the requirement that Mr. Addison submit a complaint to the IGO attaching the letter . . . ." ECF 27 at 20. However, the letter clearly cites COMAR 25.02.03 as the statutory basis. ECF 1-3 at 25. But, as defendants concede, the citation to COMAR 25.02.03 is incorrect; the correct regulation is COMAR 25.02.05.02.

instituted pursuant to this subtitle unless the claimant has first presented the claim in writing to the State Treasurer or his designee and the claim has been finally denied."[29]   *Accord Snyder v. Kavanakudy*, RDB-24-2141, 2025 WL 1940362, at *5 (D. Md. July 15, 2025).   The *Harris* Court also noted, 327 Md. at 35, 607 A.2d at 554, that the Maryland General Assembly expressed its intention that the Act "be interpreted broadly to assure that injured parties have a remedy." (Citations omitted).   If I were to adopt defendants' position, plaintiff would be deprived of a remedy, because his claims could be suspended indefinitely.

Moreover, S.G. § 12-106(c)(2) states that the requirement that the Treasurer deny a claim finally "does not apply if, within 1 year after the injury to person or property that is the basis of the claim, the State has actual or constructive notice of: (i) the claimant's injury; or (ii) the defect or circumstances giving rise to the claimant's injury."   As previously discussed, on April 17, 2024—within one year after plaintiff's injury—plaintiff submitted the Notice of Claim to the Treasurer, providing the State with actual notice of his injury and the circumstances giving rise to it.   *See* ECF 1-3 at 18–24.

Therefore, I decline to dismiss Counts III, IV, or V on the ground that plaintiff failed to comply with S.G. § 12-106(b)(2).

**3.**

Defendants also urge the Court to dismiss Count IV and the State law component of Count V, claiming that plaintiff failed to comply with the notice requirements under the MTCA.   They complain that plaintiff's notice did not "mention [] any facts giving rise to Plaintiff's claims for

---

[29] The finality status under the MTCA is not to be confused with the concept of finality for purposes of judicial review under the MPLA.

negligent training and supervision against DPSCS or malicious prosecution against Defendants Asangong and Gray in the Notice." ECF 23-1 at 18.[30]

The MTCA requires a claimant to "submit[] a written claim to the Treasurer or a designee of the Treasurer within 1 year after the injury to person or property that is the basis of the claim." S.G. § 12-106(b)(1). But, as just discussed, the MTCA would not apply to Count V (malicious prosecution), if plaintiff proves actual malice, as he has alleged.

S.G. section 12-107(a) sets forth the requirements of the notice under the MTCA. It states, *id*:

(a) A claim under this subtitle shall:

> (1) contain a concise statement of facts that sets forth the nature of the claim, including the date and place of the alleged tort;
> (2) demand specific damages;
> (3) state the name and address of each party;
> (4) state the name, address, and telephone number of counsel for the claimant, if any; and
> (5) be signed by the claimant, or the legal representative or counsel for the claimant.

Plaintiff's notice, which was filed on April 17, 2024, merely stated, in pertinent part: "Attacked by correctional officers at JCI on 12/14/23, and sustained injuries to face, head, and body." ECF 1-3 at 22. Defendants chide plaintiff for his failure to mention any facts giving rise to his claim for negligent retention, training, and supervision against DPSCS or malicious prosecution. ECF 23-1 at 18. To be sure, the statement of facts was rather skeletal. But, the plain text of the statute does not impose the high bar that defendants suggest. Nor do defendants cite

---

[30] As noted, defendants do not move to dismiss Count III pursuant to failure to provide sufficient notice under the MTCA. They appear to concede that the facts that plaintiff included in his Notice of Claim to the Treasurer were sufficient to satisfy the MTCA's notice requirements for violations of Articles 16 and 25 of the Maryland Declaration of Rights. *See* ECF 23-1 at 15–16.

any authority for the proposition that the notice must set forth every legal theory that could be raised based on a given summary of facts.

Even if the negligent training claim is too far removed from what plaintiff outlined in the notice, the Maryland Court of Appeals has recognized the doctrine of substantial compliance under the MTCA.   In *Condon,* 332 Md. at 496, the court defined substantial compliance as a "communication that provides the State 'requisite and timely notice of facts and circumstances giving rise to the claim.'" (quoting *Conaway v. State,* 90 Md. App. 234, 246, 600 A.2d 1133 (1992)).

*Simpson,* 323 Md. at 217, 592 A.2d at 1091, is informative.  There, the claimant failed to file a written claim within 180 days of the accident.  The Maryland Court of Appeals characterized claimant's untimeliness as an "outright failure to comply." *Id.* at 229.  The court wrote, *id.*: "In the absence of statutory authority to excuse the late filing, the claim against the State must fail. The doctrine of substantial compliance has no application to an outright failure to comply, and compliance in this case was a condition precedent to the maintenance of a claim against the State."

In contrast, in *Conaway*, 90 Md. App. 234, 600 A.2d 1133, a prisoner filed a timely claim with the Treasurer but did not demand specific damages, as required by S.G. § 12-107(a). Applying the doctrine of substantial compliance, the Maryland Court of Special Appeals determined that although the claim "did not literally comply with all of the requirements of [S.G.] § 12-107(a)," it provided the State with "sufficient written notice of the circumstances" of the accident to allow it to "investigate the claim and respond either by settlement or defense." *Id.* at 250 (quoting *Adams v. United States,* 615 F. 2d 284, 289 (5th Cir. 1980)).

Here, the alleged assault of plaintiff occurred on December 14, 2023.  The notice was timely filed four months later, on April 17, 2024.  It seems unreasonable to expect an attorney to

identify every possible legal claim by the time notice is provided.[31]  It is the presentation of the facts that is critical.

As I see it, plaintiff complied with the MTCA, or at least he substantially complied. Through counsel, he submitted timely notice to the Treasurer and provided the State with a summary, albeit a concise one, of what occurred, sufficient to enable the State to investigate the allegations.  ECF 1-3 at 22.  Although plaintiff did not enumerate the specific legal claims that he intended to pursue, that is not a statutory requirement.  But, from the facts alleged, the State could make an intelligent prediction of the claims that could follow.  Given the facts provided to the State, a negligent training and supervision claim is hardly far afield.

Therefore, I decline to dismiss Count IV or Count V for failure to provide sufficient notice pursuant to the MTCA.

**4.**

As noted, defendants concede the inapplicability of the MTCA to Count V under federal law.  ECF 23-1 at 19; ECF 32 at 3.  But, they maintain plaintiff has not sufficiently alleged malice or gross negligence with regard to the claim of malicious prosecution under Maryland law.  ECF 32 at 7.  Further, as discussed, *infra,* defendants contend that plaintiff has failed to sufficiently allege a malicious prosecution claim against Asangong and Gray, on the ground that they are not the proper defendants under either State or federal law, because they did not file the application for charges.

Plaintiff generally disputes the MTCA's applicability to Count V.  ECF 27 at 17.  Addison states, *id*.: "If construed as a federal malicious prosecution claim, the MTCA does not apply.  *See*

---

[31] Here, the plaintiff was incarcerated, which undoubtedly affected counsel's ability to communicate with his client.

S.G. § 12-104(a)(1). If construed as a state law claim, the MTCA does not apply to claims against individual defendants." According to plaintiff, he was not required to provide notice as to his malicious prosecution claim (Count V) pursuant to Maryland law, because he "alleges that the individual defendants acted with malice or gross negligence, [and therefore] they are not entitled to immunity" under the MTCA. ECF 27 at 17 (citing C.J. § 5-522(b)).

As indicated, the MTCA provides that State personnel are immune from suit for any "tortious act or omission that is within the scope of the public duties of the [official] and is made without malice or gross negligence, and for which the State [has] waived immunity." C.J. § 5-522(b). In that circumstance, the MTCA "substitutes the liability of the State for the liability of the state employee." *Lee*, 384 Md. at 262, 863 A.2d at 307. "And in a precisely complementary provision, the MTCA waives the state's immunity for tort actions brought in state court except where a tortious act or omission by state personnel is outside the scope of their public duties or made with malice or gross negligence." *Marks*, 600 F. App'x at 85 (citing C.J. § 5–522(a)).

"For MTCA purposes, malice is 'conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud.'" *Nero v. Mosby*, 890 F.3d 106, 127 (4th Cir. 2018) (quoting *Barbre*, 402 Md. at 182, 935 A.2d at 714); *accord Mackey v. Secure Evaluation & Therapeutic Treatment*, MJM-23-02910, 2024 WL 4335687, at *3 (D. Md. Sept. 26, 2024). "To establish malice, a plaintiff must show that the government official 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'" *Nero*, 890 F.3d at 127 (quoting *Bord v. Balt. Cnty.*, 220 Md. App. 529, 555, 104 A.3d 948, 964 (Md. App. 2014)). To overcome statutory immunity, a plaintiff "must point to *specific facts* that raise an inference that [the official's] actions were improperly motivated." *Nero*, 890 F.3d at 128 (emphasis

added). And, the "facts which make the act malicious" must be alleged "with some clarity and precision." *Elliot v. Kupferman*, 58 Md. App. 510, 526, 473 A.2d 960, 969 (1984).

In my view, plaintiff's allegations of malice with respect to Asangong and Gray are legally sufficient to establish, if proved, that they acted with the "intent to injure, knowing and deliberate wrongdoing, [and] ill-will." *Shoemaker v. Smith*, 353 Md. 143, 163, 725 A.2d 549, 559 (1999) (internal citations omitted). In particular, plaintiff has alleged that Asangong and Gray "caus[ed] an Application for Statement of Charges to be sworn out against Mr. Addison for two counts of second-degree assault, one as to CO Asangong and the other as to CO Gray," with knowledge of falsity. ECF 7, ¶ 80. According to plaintiff, the Statement of Charges "falsely stated, among other things, that Mr. Addison had 'hit COII Asangong in the face' and 'kicked COII Gray in the torso area.'" *Id.* (quoting ECF 7-3 at 5). And, according to plaintiff, Asangong and Gray instigated and instituted the criminal case against Addison with manufactured and false claims, despite Addison's exoneration with respect to all charges in internal disciplinary proceedings. ECF 7, ¶¶ 32, 39.[32]

Notably, in connection with the alleged assault of plaintiff by the CO Defendants on December 14, 2023, plaintiff alleges that he told the CO Defendants that he was going to sue them. ECF 7, ¶ 25. He recounts that, in response, CO Ross allegedly suggested to both Asangong and Gray that they should claim plaintiff struck them. *Id.* The factfinder could conclude that the defendants completely and purposely fabricated the assault accusations against plaintiff, perhaps based on the notion that the best defense is a good offense.

---

[32] As noted, on January 27, 2025, Asangong and Gray appeared at a State courthouse to testify against plaintiff. ECF 7, ¶ 44. But, neither Asangong nor Gray took the stand "because DPSCS had not provided the internal Report of Investigation of Mr. Addison's alleged assault on CO Defendants Asangong or Gray that supposedly provided the probable cause necessary to charge Mr. Addison." *Id.* Then, on March 5, 2025, the court entered *nolle prosequi* dispositions on both charges. *Id.* ¶ 45.

Plaintiff's allegations, if taken as true, state a claim for malicious prosecution that is plausible on its face. *Twombly,* 550 U.S. at 570. Plaintiff does not merely provide "labels and conclusions" or "a formulaic recitation of the elements of" malice. *Id.* at 557. Rather, plaintiff has set forth factual content to permit the reasonable inference that Asangong and Gray acted with malice towards Addison by pursuing fabricated criminal charges against him. If so, the MTCA is not applicable to plaintiff's claim against Asangong and Gray for malicious prosecution. And, in turn, the claim would not be subject to dismissal for failure to comply with the MTCA.

### E. Malicious Prosecution

Defendants contend that Addison has failed to state a malicious prosecution claim against Asangong and Gray. They argue, with respect to both the State and federal malicious prosecution claims, that Asangong and Gray "are not the proper defendants" because the Application for Charges (ECF 7-3) was made by Detective Sergeant Bonvegna. ECF 23-1 at 19; *see* ECF 32 at 12–15. In other words, Asangong and Gray contend that the allegations are legally insufficient to state a claim against them.

Under federal law, "[m]alicious prosecution redresses injuries a plaintiff sustains as a result of a defendant's improper initiation or maintenance of formal proceedings against him." *Owens v. Baltimore City State's Att'ys Off.,* 767 F.3d 379, 390 (4th Cir. 2014). Such a claim "'is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort.'" *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (quoting *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000)). Plaintiff must establish that: "(i) the suit or proceeding was instituted without any probable cause; (ii) the motive in instituting the suit was malicious . . . ; and (iii) the prosecution terminated in the acquittal or discharge of the accused." *Thompson v. Clark*, 596 U.S. 36, 44 (2022) (quoting T. Cooley, Law

of Torts 180, 181 (1980)) (internal quotation marks omitted); *see also L.M., a minor, by Roe #1 v. Graham*, 168 F.4th 196, 200–01 (4th Cir. 2026).

Further, under federal law, the underlying criminal proceeding must have been instituted without probable cause. The concept of probable cause "defies a precise definition[.]" *United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010). It is a "practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). It is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *see United States v. Ventresca*, 380 U.S. 102, 108 (1965); *United States v. Drummond*, 925 F.3d 681, 687 (4th Cir. 2019); *United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011). Notably, it is "not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014).

To determine whether there was probable cause, federal courts consider the "totality of the circumstances." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018); *Gates*, 462 U.S. at 230. Courts also consider "the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016) (quoting *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992)). "The relevant question is whether the officer took 'reasonably prudent steps' to determine the correct individual was seized." *L.M., a minor, by Roe #1*, 168 F.4th at 201 (quoting *Smith v. Munday*, 848 F.3d 248, 254-55 (4th Cir. 2017)).

As to the third element under federal law, "a Fourth Amendment claim under [42 U.S.C.] § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence," but only "that the criminal prosecution ended without a conviction." *Thompson,* 596 U.S. at 45 (finding that a state's

66

voluntary dismissal is "a  favorable termination of the underlying criminal proceeding"); *see McDonough v. Smith*, 588 U.S. 109, 116 (2019) (noting a malicious prosecution claim accrues "once the underlying criminal proceedings have resolved in plaintiff's favor."); *Cooper v. City of Wheeling, et al.*, ____ F.4th ____, 2026 WL 585778, at *5 (4th Cir. March 3, 2026) ("Appellant's [malicious prosecution] claim accrued . . .  when her criminal case was dismissed").

The Maryland common law standard for malicious prosecution is similar to that of federal law.  Under Maryland law, a plaintiff must prove: "'1) a criminal proceeding instituted or continued by the defendant against the plaintiff; 2) without probable cause; 3) with malice, or with a motive other than to bring the offender to justice; and 4) termination of the proceeding in favor of the plaintiff.'"  *Candelero v. Cole*, 152 Md. App. 190, 199, 831 A.2d 495, 500 (2003) (quoting *Heron v. Strader*, 361 Md. 258, 264, 761 A.2d 56, 59 (2000)).  Malice may be inferred from the lack of probable cause, despite being an element of the tort.  *Talley v. Anne Arundel Cty*., RDB-21-347, 2021 WL 4244759, at *12 (D. Md. Sep. 12, 2021) (citing *DiPino v. Davis*, 354 Md. 18, 55, 729 A.2d 354, 374 (1999)).

Given the overlapping nature of malicious prosecution standards under federal and State law, I will evaluate the claims together.

As noted, defendants maintain that Asangong and Gray are not proper defendants because "Asangong and Gray did not instigate any criminal proceeding against Plaintiff . . ."  ECF 32 at 14; *see* ECF 23-1 at 19.  They reason that neither Asangong nor Gray "caused Plaintiff's seizure" because they did not file the Application for Charges.  ECF 23-1 at 20.  Instead, argue defendants, it was Detective Sergeant Bonvegna who instituted the criminal proceedings against plaintiff, and they "simply cooperated in an independent investigation of the incident."  *Id.*

67

In their Reply, defendants add that plaintiff cannot maintain his federal claim because plaintiff cannot "demonstrate both but-for and proximate causation" with respect to Asangong and Gray "caus[ing] the statement of charges to be sworn out against Plaintiff." ECF 32 at 12. Defendants add that the "since Detective Sergeant Bonvegna instituted the criminal proceedings against Plaintiff, the determination is whether Detective Sergeant Bonvegna had probable cause to initiate the criminal proceedings." *Id.* at 15.

Defendants are correct that constitutional and common-law torts require both but-for and proximate causation. *Evans*, 703 F.3d at 647. But, Asangong and Gray are mistaken in their contention that they cannot be liable under federal or State law if they did not personally swear out the charges against Addison.

Acts of independent decision-makers, including investigators, "may constitute intervening superseding causes that break the causal chain between a defendant-officer's misconduct and a plaintiff's unlawful seizure." *Id.* And, "such 'intervening acts of other participants in the criminal justice system' insulate a police officer from liability." *Id.* (quoting *Zahrey v. Coffey*, 221 F.3d 342, 351 (2d Cir. 2000)). "However, even when . . . a prosecutor retains all discretion to seek an indictment,[] police officers may be held to have caused the seizure and remain liable to a wrongfully indicted defendant under certain circumstances." *Evans*, 703 F.3d at 647.

Defendants attempt to draw parallels to *Mead v. Shaw*, 716 Fed. App'x 175 (4th Cir. 2018), to support their argument that "the subsequent, independent actions of Detective Sergeant Bonvegna break the causal chain and shield Defendants Asangong and Gray from liability." ECF 32 at 13. *Shaw*, however, was at the summary judgment stage, and thus the issues were evaluated under an entirely different standard.

*Wood v. Palmer Ford Inc.*, 47 Md. App. 692, 700–01, 425 A.2d 671, 677 (1981), is

instructive.   There, the Maryland Court of Special Appeals explained (quoting Prosser, *Law of*

*Torts* pp. 836–837 (4th ed. 1971) (footnotes omitted)) (emphasis added):

> "The defendant may be liable either for initiating or for continuing a criminal
> prosecution without probable cause. But he cannot be held responsible unless he
> takes some active part in instigating or encouraging the prosecution. He is not liable
> merely because of his approval or silent acquiescence in the acts of another, nor for
> appearing as a witness against the accused, even though his testimony is perjured,
> since the necessities of a free trial demand that witnesses are not to be deterred by
> fear of tort suits, and shall be immune from liability. *On the other hand, if he*
> *advises or assists another person to begin the proceedings, ratifies it when it is*
> *begun in his behalf, or takes any active part in directing or aiding the conduct of*
> *the case, he will be responsible.* The question of information laid before prosecuting
> authorities has arisen in many cases. If the defendant merely states what he believes,
> leaving the decision to prosecute entirely to the uncontrolled discretion of the
> officer, or if the officer makes an independent investigation, or prosecutes for an
> offense other than the one charged by the defendant, the latter is not regarded as
> having instigated the proceeding; but if it is found that his persuasion was the
> determining factor in inducing the officer's decision, or that he gave information
> which he knew to be false and so unduly influenced the authorities, he may be held
> liable."

The court continued: "'One who instigates or aids and assists in a criminal prosecution may

be liable [for malicious prosecution] regardless of whether he swears out a warrant.'"   *Wood*, 47

Md. App. at 701, 425 A.2d at 677 (quoting *Safeway Stores, Inc. v. Barrack*, 210 Md. 168, 174,

122 A.2d 457, 457 (1956)).   The *Wood* Court stated, 47 Md. App. at 701, 425 A.2d at 677 (internal

citation marks and citation omitted): "While mere passive knowledge and consent to the acts of

another, is not sufficient to render a party liable, . . . voluntary aid and assistance undoubtedly

will."

An officer who did not initiate charges but presented false information may be held liable

for malicious prosecution.   *Crouch v. City of Hyattsville*, DKC-09-2544, 2012 WL 6019296, at *3

(D. Md. Nov. 30, 2012).   At this juncture, "it is irrelevant" that Officers Asangong and Gray did

not personally swear out the Statement of Charges for plaintiff "because an individual may still be

liable when he 'inspire[s] in any fashion a criminal proceeding against the (plaintiff) within the contemplation of the law of torts.'" *Id.* (quoting *Smithfield Packing Co., Inc. v. Evely*, 169 Md. App. 578, 905 A.2d 845, 854 (2006)).

Plaintiff asserts that, in the aftermath of the assault on December 14, 2023, he told the CO Defendants he intended to sue them. ECF 7, ¶ 25. In response, CO Ross allegedly urged Asangong and Gray to manufacture the claims that plaintiff had struck them. *Id.* To that end, Asangong and Gray appeared at the courthouse on January 27, 2025, in order to testify against plaintiff. *Id.* ¶ 44. But, on March 5, 2025, the court entered *nolle prosequi* dispositions as to both charges against Addison. *Id.* ¶ 45.

As discussed, plaintiff further alleges that Asangong and Gray falsely, maliciously, and without probable cause induced the issuance of the Statement of Charges against Addison. ECF 7-3 at 5; *see* ECF 7, ¶ 80. Addison asserts that his seizure was unsupported by probable cause because the Statement of Charges contains false statements, including that "Mr. Addison had 'hit COII Asangong in the face' and 'kicked COII Gray in the torso area.'" ECF 7, ¶ 80 (quoting ECF 7-3 at 5). Asangong and Gray allegedly provided those claims to Bonvengna. And, according to Addison, by that time, "he had already been found not guilty of assaulting COs Asangong and Gray in internal prison disciplinary proceedings." ECF 27 at 22 (citing ECF 7, ¶ 39).

Addison must allege "nonconclusory factual details" in his Amended Complaint. But, this requirement is "tempered by the recognition that a plaintiff may only have so much information at his disposal at the outset" of litigation. *Robertson*, 679 F.3d at 291; *accord Lowy*, 2026 WL 376731, at *9. Plaintiff's "complaint need not 'make a case' against a defendant or '*forecast evidence* sufficient to *prove* an element' of the claim. It need only '*allege facts* sufficient to *state* elements' of the claim." *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 349 (4th Cir.

2005) (emphases in original) (citations omitted).  And, at the motion to dismiss stage, I need only be able to draw the reasonable inference that Asangong and Gray are liable for the alleged misconduct.  *See Iqbal*, 556 U.S. at 663.

In essence, plaintiff suggests that Bonvegna was a strawman.  Defendants cannot hide behind the fact that Bonvegna signed the Application for Charges.  ECF 7-3 at 4–5.  Addison has alleged facts that, if proved, make it plausible that Asangong and Gray caused the malicious prosecution of Addison.  Notably, the Court may infer malice from the alleged deliberate falsehoods, the claim of lack of probable cause, *Talley*, 2021 WL 4244759 at *12, and the *nolle prosequi* disposition.  *See Litchfield v. Rinehart*, GLR-21-2101, 2022 WL 3716525, at *7 (D. Md. Aug. 29, 2022) (citing *Hines v. French*, 157 Md. App. 536, 554, 852 A.2d 1047, 1057 (2004) ("A nol pros acts as a dismissal and, thus, the prosecution of appellant . . . ended in her favor.")).

Accordingly, I shall deny defendants' Motion with respect to Count V, pursuant to 42 U.S.C. § 1983 and State law.

### IV.   Conclusion

For the foregoing reasons, I shall grant the Motion, in part.  In particular, I shall dismiss, Count II as to DPSCS.  I shall also dismiss Count II against Warden Dean, without prejudice.  But, I shall deny the Motion with respect to Count III, Count IV, and Count V.

An Order follows, consistent with this Memorandum Opinion.

Date: March 20, 2026

_____/s/_____
Ellen L. Hollander
United States District Judge

71